## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | § | **Chapter 11** |
| | § | |
| GLOBAL AVIATION HOLDINGS INC., ET AL.[1] | § | **Case No. 13- 12945 (MFW)** |
| | § | |
| Debtors. | § | **(Joint Administration Requested)** |
| | § | |

---

### MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF

Global Aviation Holdings Inc. ("Global Aviation") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") file this Motion of the Debtors for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Parties, (iii) Scheduling a Final Hearing, and (iv) Granting Related Relief (the "Motion"), and respectfully represent:

### Background

1.      The Debtors provide military, cargo, passenger and commercial charter air transportation services.  The Debtors operate their businesses through their two airlines: World Airways, Inc. ("World") and North American Airlines, Inc. ("North American").  The Debtors employ approximately 1,040 employees and have annual 2013 forecasted revenues in excess of $400 million.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, include: Global Aviation Holdings Inc. (2196); Global Shared Services, Inc. (1692); New ATA Acquisition Inc. (1985); New ATA Investment Inc. (2109); North American Airlines, Inc. (8792); World Air Holdings, Inc. (1036); and World Airways, Inc. (8276).  The Debtors' corporate address is 101 World Drive, Peachtree City, Georgia 30269.

2.      The Debtors are the largest provider of private airlift services to the United States military through a diverse fleet offering both passenger and cargo services.  Global Aviation, through its two subsidiaries (North American and World), operates in three distinct lines of business: (a) passenger and cargo flying for the United States military, (b) passenger and cargo flying for commercial customers, and (c) full service flying for non-military charter customers.

3.      Each of the Debtors previously filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the Eastern District of New York in February 2012 (the "Prior Bankruptcy").[2]  The Prior Bankruptcy was jointly administered as Case No. 12-40783.  The Bankruptcy Court for the Eastern District of New York confirmed a plan of reorganization in the Prior Bankruptcy, which became effective on February 13, 2013.

4.      Following its reorganization in the Prior Bankruptcy, the Debtors continued to encounter various financial and operational hurdles, including decreased demand for military cargo and passenger services resulting from government budget constraints.  Specifically, cargo revenue from military flying decreased due to the unexpected cancellation of fixed buy missions by the United States Air Mobility Command ("AMC").  In addition, AMC recently and unexpectedly cancelled all expansion flying beginning December 1, 2013, which reduced planned revenue for 2013 by approximately $13 million and for 2014 by approximately $54 million and created significant over-capacity in the military charter cargo business.  Further frustrating the Debtors' ability to meet its obligations, the shutdown of the U.S. government in October 2013 significantly delayed payments owed to the Debtors for military flying.  Despite numerous immediate cost-reducing efforts undertaken by the Debtors, liquidity continued to

---

[2] In addition to each of the Debtors, Global Aviation Ventures SPV LLC ("Ventures") and World Airways Parts Company, LLC ("Parts") were also debtors in the Prior Bankruptcy.  Ventures and Parts merged into the Debtors and no longer exist.

rapidly deteriorate in 2013, requiring the Debtors to restructure their operations and financial affairs.

5.    To facilitate a further restructuring of the Debtors' businesses, on the date hereof (the "Petition Date"), each of the Debtors commenced cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of the Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

6.    A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Motion and the Debtors' Chapter 11 Cases are set forth in greater detail in the *Declaration of William A. Garrett, Executive Vice President and Chief Financial Officer of Global Aviation Holdings Inc., in Support of First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith.

## Jurisdiction

7.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    The bases for the relief requested herein are sections 105(a), 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

and Rule 4001-2 of the Local Rules of Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "Local Rules").

**Relief Requested**

10.     By this motion, the Debtors request entry of an interim order, substantially in the

form attached hereto as **Exhibit B** (the "Interim Order"), and a final order (the "Final Order") to

be submitted to the Court for approval in connection with the final hearing on the motion (the

"Final Hearing"):

(a)     authorizing the Debtors to obtain post-petition loans, advances and other financial accommodations on an interim basis for a period through and including the date of the Final Hearing from the DIP Agent[3], for itself and the DIP Lenders, secured by security interests in and liens upon the Collateral pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code;

(b)     authorizing the Debtors to enter into, be bound by, and perform under the DIP Facility and the DIP Credit Agreement attached hereto as **Exhibit A**;

(c)     modifying the automatic stay to the extent set forth in the Interim Order;

(d)     granting to the DIP Agent, for the benefit of the DIP Lenders, superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(e)     authorizing the Debtors to use the Pre-Petition Collateral (including Cash Collateral) subject to the existing liens and security interests in favor of the Pre-Petition Agents, on behalf of the Pre-Petition Lenders, and granting adequate protection to these parties as set forth in the Interim Order; and

(f)     scheduling the Final Hearing.

---

[3] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Interim Order.

**Concise Statement of the Material Terms of the DIP Credit Agreement and Interim Order**[4]

11.    Pursuant to, and in accordance with, Bankruptcy Rule 4001(b) and Local Rule 4001-2, the following is a concise statement of the material provisions of the DIP Facility:

| Summary of Material Terms | | Location |
|---|---|---|
| **DIP Credit Agreement Parties** | Borrowers:  Global Aviation Holdings Inc., North American Airlines, Inc., and World Airways, Inc.<br><br>Guarantors: New ATA Investment Inc., New ATA Acquisition Inc., World Air Holdings, Inc., and Global Shared Services, Inc.<br><br>Lenders:  The DIP Lenders, as identified in the DIP Credit Agreement<br><br>Administrative Agent and Collateral Agent:  Cerberus Business Finance, LLC | Agreement: Preamble<br><br>Interim Order: Preamble |
| **Borrowing Limit and Availability** | The DIP Credit Agreement provides for a Total Revolving Credit Commitment in the amount of $51,000,000, consisting of the sum of the Existing Senior Obligations as of the Petition Date plus $12,000,000.  The Existing Senior Obligations are the "Obligations" as defined under the First Lien Credit Facility.<br><br>The Debtors are authorized to immediately borrow, pursuant to the DIP Credit Agreement, an aggregate amount not to exceed $36,000,000 in accordance with the Budget and the terms of the Interim Order and subject to certain Permitted Variances described in the Interim Order. | Agreement: § 2.01<br><br>Interim Order: ¶ 1.2 |
| **Use of Proceeds** | The proceeds of the DIP Facility shall be used (a) for working capital and general corporate purposes of the Debtors and (b) to pay fees and expenses related to the DIP Credit Agreement and the Chapter 11 Cases.  The proceeds of the DIP Facility shall only be used in accordance with the Budget, the Interim Order, and the DIP Credit Agreement. | Agreement: § 7.01(s)<br><br>Interim Order: ¶ 1.2. |
| **Conditions** | The DIP Credit Agreement contains certain conditions precedent to the effectiveness of the DIP Credit Agreement (contained in Section 6.01 of the DIP Credit Agreement), certain conditions precedent to the obligation of any DIP Lender to make any Loan during the Final Period (contained in Section 6.02 of the DIP Credit Agreement), and certain conditions precedent to the obligation of the DIP Agent or any | Agreement: §§ 6.01, 6.02, 6.03 |

---

[4] This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents or the Interim Order, as applicable.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Loan Documents, the provisions of the DIP Loan Documents shall control and the Interim Order shall control over the DIP Credit Agreement.  Any capitalized terms used but not defined in the concise statement shall have the meanings ascribed to such terms in the DIP Credit Agreement or the Interim Order, as applicable.

| Summary of Material Terms | | Location |
|---|---|---|
| | DIP Lender to make any Loan after the Interim Facility Effective Date (contained in Section 6.03 of the DIP Credit Agreement). | |
| **Term/Maturity Date** | The Final Maturity Date is the earliest of (a) the date which is 40 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (b) the date that is six (6) months from the date of the DIP Credit Agreement or such later date to which the DIP Agent consents in writing in its sole and absolute discretion, (c) the earlier of the effective date or the substantial consummation of a plan of reorganization or liquidation in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (d) the date of a sale or liquidation of substantially all of the Equity Interests or assets of the Debtors; and (e) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of the DIP Credit Agreement and the other Loan Documents. | Agreement: § 1.01 |
| **Interest Rates** | Reference Rate Loans shall bear interest at a per annum rate equal to the sum of the Reference Rate plus 8.50%.  Reference Rate means the greatest of (a) 4.00% per annum, (b) the Federal Funds Rate plus 0.50% per annum, (c) the LIBOR Rate plus 1.00% per annum, and (d) the rate of interest publicly announced by JP Morgan Chase Bank in New York, New York from time to time as its reference rate, base rate or prime rate.<br><br>LIBOR Rate Loans shall bear interest at a per annum rate equal to the sum of the LIBOR Rate plus 9.00%. | Agreement: §2.04 |
| **Fees** | The DIP Credit Agreement requires the Debtors to pay certain fees to the DIP Lenders, including (a) a Closing Fee in an amount equal to 1.00% times the Total Revolving Credit Commitment payable on the Interim Facility Effective Date, (b) an Unused Line Fee that accrues at the rate per annum of 0.75% on the excess, if any, to a maximum of $12,000,000 of the Total Revolving Credit Commitment over the average principal amount of all Revolving Loans outstanding from time to time and shall be payable monthly in arrears on the first day of each month; and (c) an Audit and Collateral Monitoring Fee consisting of the out-of-pocket costs and reasonable expenses of any examiner and/or any third party appraisers and/or professionals employed by the DIP Agent payable on demand. | Agreement: § 2.06 |
| **Cash Sweeps and Repayment** | Funds collected by the Debtors shall be deposited into the Concentration Accounts.  The daily cash balances in excess of $1 million in the aggregate from the Concentration Accounts and other Cash Management Accounts shall be swept daily, at the open of business, to the Cerberus Sweep Account, and the funds therein shall be applied in accordance with Section 5.03(a) of the DIP Credit Agreement.<br><br>All funds in the Cerberus Sweep Account shall be applied as follows: | Agreement: §§ 9.01(c), 5.03(a) |

| Summary of Material Terms | | Location |
|---|---|---|
| | • *first*, ratably, to pay the Existing Senior Obligations in respect of any fees, expense reimbursement, indemnities and other amounts due as of the Filing Date to the Existing Senior Agents until paid in full, | |
| | • *second*, ratably, to pay the Existing Senior Obligations in respect of any fees and indemnities due as of the Filing Date to the Existing Senior Lenders until paid in full, | |
| | • *third*, ratably, to pay interest due as of the Filing Date on the Existing Senior Obligations until paid in full, | |
| | • *fourth*, ratably, to pay the principal of all Existing Senior Obligations existing as of the Filing Date until paid in full, | |
| | • *fifth*, ratably, to pay any other Existing Senior Obligations existing as of the Filing Date under the Existing Senior Loan Documents, until paid in full, | |
| | • *sixth*, ratably, to pay the Obligations in respect of any fees, expense reimbursement, indemnities and other amounts then due and payable to the DIP Agent until paid in full, | |
| | • *seventh*, ratably, to pay the Obligations in respect of any fees and indemnities then due and payable to the DIP Lenders until paid in full, | |
| | • *eighth*, ratably, to pay interest then due and payable on the Revolving Loans until paid in full, | |
| | • *ninth*, ratably, to pay the principal of all Revolving Loans then outstanding until paid in full, | |
| | • *tenth*, ratably, to pay any other Obligations then outstanding under the DIP Loan Documents, until paid in full, and | |
| | • *eleventh*, to the Debtors or to such other Person entitled thereto under applicable law. | |
| **Liens** | To secure the prompt payment and performance of any and all DIP Obligations, the DIP Agent, for the benefit of itself and the other DIP Lenders, shall have and is granted, effective as of the Petition Date, valid and perfected first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' Estates may have (but subject to the Permitted Liens and the Carve Out Expenses), in and upon all of the Collateral. Notwithstanding the foregoing or anything to the contrary contained in the DIP Credit Agreement, the grant to the DIP Agent and the DIP Lenders of liens on and security interests in Chapter 5 Actions shall be subject to the entry of the Final Order. | Agreement: § 4.01<br><br>Interim Order: ¶ 2.1.1 |

| Summary of Material Terms | | Location |
|---|---|---|
| **Superpriority Claim** | For all DIP Obligations now existing or hereafter arising pursuant to the Interim Order, the DIP Loan Documents or otherwise, the DIP Agent, for the benefit of itself and the other DIP Lenders, is granted an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code; provided, however, that the Superpriority Claim shall be subject only to the Permitted Liens, Carve Out Expenses, and the DIP Liens. | Agreement: § 4.02<br><br>Interim Order: ¶ 2.2 |
| **Adequate Protection** | The Debtors propose to provide the Pre-Petition Agents and the Pre-Petition Lenders with five primary forms of adequate protection (the "Adequate Protection Package"):<br><br>*First*, the Debtors will provide the Pre-Petition Agents, on behalf of the Pre-Petition Lenders, the Pre-Petition Lender Replacement Liens in the Replacement Collateral to the extent of any diminution in value of the interests of the Pre-Petition Agents, on behalf of the Pre-Petition Lenders, in the Pre-Petition Collateral, including, without limitation, the Cash Collateral.<br><br>*Second*, the Debtors will grant the Pre-Petition Agents, on behalf of the Pre-Petition Lenders, allowed super-priority administrative claims pursuant to section 507(b) of the Bankruptcy Code, which super-priority claims shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, other than the Superpriority Claim.<br><br>*Third*, the First Lien Agent and First Lien Lenders will receive from the Debtors monthly adequate protection payments in accordance with, and in the amounts set forth in, the Budget, which shall include the payment of all interest under the First Lien Loan Documents at the default rate in accordance with the terms of the First Lien Loan Documents.<br><br>*Fourth*, the Debtors will pay the reasonable fees, costs, and expenses for the professionals advising the First Lien Agent and the First Lien Lenders within seven (7) days following receipt of any invoice therefor, with a copy to the Committee and the U.S. Trustee. No application for payment of such fees, costs, and expenses shall be required, and the payment of such fees, costs, and expenses shall not be subject to the United States Trustee Guidelines. If any such payment(s) are disputed by a party in interest under Bankruptcy Code section 506(b) and ultimately not allowed under such provision, the Court may order that such payment(s) be recharacterized as a payment of principal on the First Lien Obligations<br><br>*Fifth*, the Debtors will maintain the Pre-Petition Collateral (including the Replacement Collateral) and maintain insurance with respect | Interim Order: ¶ 2.4 |

| Summary of Material Terms | | Location |
|---|---|---|
| | thereto, consistent with the requirements of the Pre-Petition Loan Documents. | |
| **Priority of Liens** | The DIP Liens shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, but subject to the Permitted Liens and to the Carve Out Expenses.<br><br>The First Lien Replacement Liens shall be junior and subordinate only to (i) the Permitted Liens, (ii) the Carve Out Expenses, and (iii) the DIP Liens.<br><br>The Second Lien Replacement Liens shall be junior and subordinate only to (i) the Permitted Liens, (ii) the Carve Out Expenses, (iii) the DIP Liens, (iv) the First Liens, and (v) the First Lien Replacement Liens.<br><br>The Third Lien Replacement Liens shall be junior and subordinate only to (i) the Permitted Liens, (ii) the Carve Out Expenses, (iii) the DIP Liens, (iv) the First Liens, (v) the First Lien Replacement Liens, (vi) the Second Liens, and (vii) the Second Lien Replacement Liens. | Agreement: § 4.01<br><br>Interim Order: ¶¶ 2.1.2, 2.4.2(a), 2.4.3(a), 2.4.4(a) |
| **Events of Default** | The occurrence of any of the following events shall constitute an Event of Default under the Interim Order and the DIP Loan Documents:<br><br>(a)  dismissal or conversion of any of the Chapter 11 Cases;<br><br>(b)  any Debtor shall file or otherwise support a motion, or other pleading, seeking conversion or dismissal of any of any of the Chapter 11 Cases;<br><br>(c)  a trustee under Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the Debtors' business shall be appointed or elected under Section 1106 of the Bankruptcy Code in any of the Cases;<br><br>(d)  any other superpriority administrative expense claim which is senior to or *pari passu* with the Superpriority Claim or the First Lien Adequate Protection Claims shall be granted;<br><br>(e)  the Interim Order or the Final Order, as the case may be, shall be stayed, amended, modified, supplemented, reversed, revoked or vacated;<br><br>(f)  the Debtors seek any extension or modification of the Interim Order without obtaining the DIP Agent's written consent, which consent may be withheld in the DIP Agent's sole and absolute discretion;<br><br>(g)  (i) the Debtors shall assert in any pleading filed in any court | Agreement: § 10.01<br><br>Interim Order: ¶ 7.1 |

| Summary of Material Terms | Location |
|---|---|
| that any material provision of the Interim Order is not valid and binding for any reason, or (ii) any material provision of the Interim Order shall, for any reason, cease to be valid and binding without the prior written consent of the DIP Agent, which consent may be withheld in the DIP Agent's sole and absolute discretion;<br><br>(h)  the Debtors' failure to obtain entry of a Final Order within thirty (30) days after entry of the Interim Order;<br><br>(i)  a plan of reorganization or liquidation shall be confirmed in any of the Chapter 11 Cases which does not provide for termination of the commitment under the DIP Facility and payment in full of the DIP Obligations and the First Lien Obligations in cash on the effective date of such plan;<br><br>(j)  the entry of an order dismissing any of the Chapter 11 Cases that does not provide for the termination of the commitment under the DIP Facility and payment in full of the DIP Obligations and the First Lien Obligations in cash prior to dismissal;<br><br>(k)  (i) the commencement of any action against the DIP Agent, any DIP Lender, First Lien Agent or any First Lien Lender, or their respective agents, advisors or employees, to subordinate or avoid any liens or claims that arose in connection with the DIP Loan Documents or First Lien Loan Documents or (ii) the Committee or another party in interest asserts or seeks leave to file, assert or commence a Challenge;<br><br>(l)  the Debtors shall take any action, including the filing of any document with the Court, in support of any of the foregoing, or any person other than the Debtors shall take any such action and such action is not contested in good faith by the Debtors;<br><br>(m)  the entry of an order of the Court granting relief from the automatic stay to the holder of any claim against one or more of the Debtors (other than a claim for personal injury that is covered by liability insurance) equal to or exceeding $250,000;<br><br>(n)  the Debtors' failure to timely achieve any of the Sale Milestones;<br><br>(o)  the Debtors' failure to obtain approval of an updated Budget pursuant to Paragraph 1.4 of the Interim Order;<br><br>(p)  the Debtors' actual receipts in any trailing two-week period following the first week after entry of the Interim Order are less than 90% of the projected amount set forth in the approved Budget covering that period; | |

| Summary of Material Terms | Location |
|---|---|
| (q) if any material contract of the Debtors is rejected or otherwise terminated or modified or not renewed, or any counterparty to a material contract suspends or diminishes its utilization of the benefits of such contract, in either case, in a manner that is disadvantageous to the Debtors' operations or prospects, or any material property of the Debtors is sold, in each instance, without the express written consent of the DIP Agent in its sole and absolute discretion;<br><br>(r) any Debtor's breach, in any respect, of any of the terms, conditions, covenants or obligations under the Interim Order, including the disbursements limitations set forth in Paragraph 1.2 of the Interim Order; provided, that the failure to comply with a term or condition of any Pre-Petition Loan Document that is incorporated into the Interim Order (other than pursuant to Section 5 of the Interim Order) shall not be an Event of Default unless it is not cured within three (3) business days after the Debtors have been notified of such breach; or<br><br>(s) any other Event of Default under the DIP Credit Agreement or any of the other DIP Loan Documents. | |
| **Carve Out Expenses**    Upon the Carve Out Trigger Notice delivered following the occurrence and during the continuation of an Event of Default under the DIP Loan Documents, the DIP Agent's and the DIP Lenders' liens, claims and security interests in the Collateral and their Superpriority Claim, and the Pre-Petition Agents' and Pre-Petition Lenders' liens, claims and security interests in the Pre-Petition Collateral (including Cash Collateral), and the Replacement Collateral and their Pre-Petition Lender Adequate Protection Claims shall, in each instance, be subject to the right of payment of the Carve Out Expenses:<br><br>(a) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);<br><br>(b) fees payable to the Clerk of this Court;<br><br>(c) the lesser of (i) the amount of the unpaid and outstanding reasonable fees, costs and expenses actually incurred by the Debtors' professionals (including ordinary course professionals) and (ii) the budgeted and unpaid amount of the fees, costs and expenses of the Debtors' professionals (including ordinary course professionals), as set forth in the approved Budget, in each case for the period from and after the Petition Date and prior to the delivery of a Carve Out Trigger Notice, minus the collective amounts of the retainers held by the Debtors' professionals (including ordinary course professionals) as of delivery of a Carve Out Trigger Notice; provided, that such fees, costs and expenses are ultimately allowed by a final order of the Court pursuant to Section 330 of the Bankruptcy Code (whether allowed before or after the | Agreement: §§ 1.01, 4.01(c), 4.02<br><br>Interim Order: ¶ 2.3 |

| Summary of Material Terms | Location |
|---|---|
| delivery of a Carve Out Trigger Notice) | |
| (d) the lesser of (i) the amount of the unpaid and outstanding reasonable fees, costs and expenses actually incurred by the Committee's professionals and (ii) the budgeted and unpaid amount of the fees, costs and expenses of the Committee's professionals, as set forth in the approved Budget, in each case for the period from and after the Petition Date and prior to the delivery of a Carve Out Trigger Notice, minus the collective amounts of the retainers held by the Committee's professionals as of delivery of a Carve Out Trigger Notice; provided, that such fees, costs and expenses are ultimately allowed by a final order of the Court pursuant to Section 330 of the Bankruptcy Code (whether allowed before or after the delivery of a Carve Out Trigger Notice);<br><br>(e) the amount of the unpaid and outstanding reasonable Debtors' professionals' (including ordinary course professionals') fees, costs, and expenses that are incurred from and after the delivery of a Carve Out Trigger Notice in an aggregate amount not in excess of $100,000; and<br><br>(f) the amount of the unpaid and outstanding reasonable Committee's professionals' fees, costs, and expenses that are incurred from and after the delivery of a Carve Out Trigger Notice in an aggregate amount not in excess of $25,000.<br><br>Other than $25,000 made available to the Committee for lien investigation, none of the Carve Out Expenses, proceeds from the DIP Facility, the Collateral, the Pre-Petition Collateral (including Cash Collateral) or the Replacement Collateral may be used for the payment of the fees, costs and expenses of any person (i) to challenge, as opposed to investigate, the amount, validity, perfection, priority, extent or enforceability of the Pre-Petition Obligations or the Pre-Petition Liens, (ii) to pursue any claim or causes of action of any kind against the DIP Agent, any DIP Lender, any Pre-Petition Agent, or any Pre-Petition Lender, (iii) to seek to use Cash Collateral in a manner or for a purpose to which the DIP Agent and First Lien Agent have not consented to in advance in writing, including, without limitation, seeking use of Cash Collateral over the objection of the DIP Agent and First Lien Agent, (iv) to seek to surcharge the Collateral, the Pre-Petition Collateral (including Cash Collateral) or the Replacement Collateral under Section 506(c) of the Bankruptcy Code or otherwise, or (v) to object to the exercise of remedies by the DIP Agent or First Lien Agent following an Event of Default. | |
| **Budget and Reporting Provisions** | An updated Budget must be approved by the DIP Agent, in its sole and absolute discretion, by no later than the end of each four (4) week period following the entry of the Interim Order.<br><br>Limitations on variances from the Budget are stated in Paragraph 1.2 of the Interim Order and Section 8.03 of the DIP Credit Agreement.<br><br>Each week, the Debtors are required to provide the DIP Agent, with a | Agreement: §§ 8.01(a), 8.03<br><br>Interim Order: ¶¶ 1.2, 1.3 |

| Summary of Material Terms | | Location |
|---|---|---|
| | copy to the U.S. Trustee and the Committee, with an updated 13-week cash forecast in form consistent with the form of the Budget and supporting information in detail reasonably acceptable to the DIP Agent. | |
| **Stipulations of the Debtors** | As of the Petition Date, the outstanding First Lien Obligations totaled no less than $39,000,000, exclusive of all accrued and unpaid interest, costs, expenses, and fees owed to the First Lien Agent and First Lien Lenders.<br><br>The First Liens (1) are valid, binding, enforceable and perfected liens in the Pre-Petition Collateral, (2) were granted to the First Lien Agent for the benefit of the First Lien Lenders for fair consideration and reasonably equivalent value, (3) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or non-bankruptcy law, and (4) are subject and subordinate only to valid, perfected and unavoidable liens permitted under the applicable First Lien Loan Documents, but only to the extent that (x) such liens are permitted by the applicable First Lien Loan Documents to be senior to the applicable First Liens and (y) such liens are actually senior to the applicable First Liens under applicable law ((x) and (y) together, the "Permitted Liens").<br><br>(1) All of the First Lien Obligations constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable First Lien Loan Documents, (2) no setoffs, recoupments, offsets, defenses or counterclaims to any of the First Lien Obligations exist, and (3) no portion of the First Lien Obligations or any payments, transfers or obligations made to or for the benefit of the First Lien Agent or any of the First Lien Lenders are subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or non-bankruptcy law.<br><br>The Subordination Agreement was entered into in good faith, is fair and reasonable to the parties thereto, is enforceable in accordance with its terms, and is an enforceable subordination agreement under Section 510(a) of the Bankruptcy Code. | Interim Order: Recital ¶ D. |
| **Challenge Provisions** | The Debtors' Stipulations set forth in Recital D of the Interim Order shall be binding upon the Debtors and their Estates in all circumstances upon entry of the Interim Order.<br><br>The Stipulations shall be binding upon all other parties in interest, including the Committee, unless the Committee or any other party in interest (including any Chapter 11 or Chapter 7 trustee) other than the Debtors, *first*, commences a Challenge during the Challenge Period, and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action. | Interim Order: ¶ 9.1 |

| Summary of Material Terms | Location |
|---|---|
| The Challenge Period is the period between the Petition Date and the Challenge Period Termination Date.  The Challenge Period Termination Date is the next calendar day after the earlier of (x) with respect to the Committee, sixty (60) calendar days from the formation of any Committee, and (y) solely if no Committee is formed within thirty (30) days following the Petition Date, with respect to other parties in interest with requisite standing other than the Debtors or the Committee, seventy-five (75) calendar days following the date of entry of the Interim Order. <br><br> If a Chapter 7 trustee or a Chapter 11 trustee is appointed during the Challenge Period, the Challenge Period Termination Date, with respect to such trustee only, shall be the later of (i) seventy-five (75) calendar days following the date of entry of the Interim Order and (ii) the date that is twenty (20) days after the date on which such trustee is appointed. <br><br> Upon the Challenge Period Termination Date and for all purposes in these Cases and any successor case, (i) all payments made to or for the benefit of the First Lien Agent and the First Lien Lenders pursuant to the Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (iii) the First Lien Obligations shall be deemed to be a fully-allowed secured claim within the meaning of Section 506 of the Bankruptcy Code, and (iv) the Stipulations, including the release provisions therein, shall be binding on all parties in the Chapter 11 Cases, including the Committee.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on all parties in the Cases, including the Committee, from and after the Challenge Period Termination Date, except to the extent that such Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly and successfully challenged. | |
| **Waiver/Modification of Automatic Stay** | The Interim Order provides that the automatic stay provisions of Section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit the DIP Agent, on behalf of itself and the DIP Lenders, and the Pre-Petition Agents, acting on behalf of themselves and the Pre-Petition Lenders, to perform any act authorized or permitted under or by virtue of the Interim Order or the DIP Loan Documents, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by the Interim Order and pursuant to the terms of the DIP Loan Documents, and (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral or Replacement Collateral. <br><br> Upon the occurrence of an Event of Default and after providing | Interim Order: ¶ 7.4 |

| Summary of Material Terms | Location |
|---|---|
| five (5) business days prior written notice (the "Enforcement Notice") to counsel for the Debtors, counsel for the Committee (if appointed) and the U.S. Trustee, unless the Event of Default is cured within the five (5) business day notice period, the DIP Agent, acting on behalf of itself and the DIP Lenders, and the First Lien Agent, acting on behalf of itself and the First Lien Lenders, shall be entitled to take any action and exercise all rights and remedies provided to them by the Interim Order, the DIP Loan Documents, the First Lien Documents or applicable law as the DIP Agent or First Lien Agent may deem appropriate in their sole discretion to, among other things, proceed against and realize upon the Collateral, Pre-Petition Collateral or Replacement Collateral or any other assets or properties of Debtors' Estates upon which the DIP Agent, for the benefit of itself and the DIP Lenders, and the First Lien Agent, for the benefit of itself and the First Lien Lenders, have been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all DIP Obligations and the First Lien Obligations.  Within the five (5) business day period, a party in interest may file an emergency motion for a hearing within such period for a determination solely as to whether an Event of Default occurred under the Interim Order and the DIP Loan Documents or as to whether an Event of Default has been cured within such period. | |
| **Sale Milestones** | The Debtors are required to achieve the Sale Milestones set forth in Paragraph 4.2 of the Interim Order. | Agreement: §§ 1.01, 8.01(q)<br><br>Interim Order: ¶ 4.2 |
| **Release of First Lien Agent, First Lien Lenders, and Related Parties** | In consideration of the First Lien Agent's and First Lien Lenders' consent to the Debtors' use of Cash Collateral, each Debtor, on behalf of itself, its estate, and its respective successors, assigns, and other legal representatives (collectively, the "First Lien Releasors"), hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges the First Lien Agent and each First Lien Lender and their respective successors and assigns, and their present and former shareholders, equityholders, members, managers, partners, affiliates, subsidiaries, divisions, predecessors, directors, officers, agents, attorneys, financial advisors, consultants, employees and other representatives (all such parties being hereinafter referred to collectively as the "First Lien Releasees" and individually as a "First Lien Releasee"), of and from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, demands, liabilities, responsibilities, disputes, remedies, causes of action, defenses, setoffs, recoupments, other offset rights, indebtedness and obligations, of every kind, nature and description, whether arising at law or in equity, including, without limitation, any so-called "lender liability" claims or defenses, that First Lien Releasors had, have or hereafter can or may have against First Lien Releasees as of the date hereof, relating to and/or otherwise in connection with the First Lien Obligations, the First Lien Loan Documents, the First Liens, the Pre-Petition Collateral, or the debtor-creditor relationship between any of | Interim Order: Recital ¶ D(iii) |

| Summary of Material Terms | Location |
|---|---|
| the First Lien Agent and the First Lien Lenders, on the one hand, and any of the Debtors, on the other hand, including, without limitation, (i) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to Section 105 or Chapter 5 of the Bankruptcy Code or under any other similar provisions of non-bankruptcy law, (ii) any right or basis to challenge or object to the amount, validity, extent, enforceability and non-avoidability of the First Lien Obligations, (iii) any transfers relating to and/or otherwise in connection with the First Lien Obligations, and (iv) the validity, perfection, priority, extent, enforceability, and non-avoidability of the First Liens. | |

## Material Provisions Pursuant to Local Rule 4001-2

12.    Pursuant to Local Rule 4001-2, the Debtors are required to disclose the following provisions of the Interim Order:

- **Provisions for Investigating Liens (L.R. 4001-2(a)(i)(B)).** The Interim Order provides that any Challenge to the First Lien Obligations or the First Liens shall be filed with the Court (a) with respect to the Committee, sixty (60) calendar days from the formation of any Committee, and (b) solely if no Committee is formed within thirty (30) days following the Petition Date, with respect to other parties in interest with requisite standing other than the Debtors or the Committee, seventy-five (75) calendar days following the date of entry of the Interim Order. Interim Order, ¶ 9.1.

- **Waiver of Section 506(c) Claims (L.R. 4001-2(a)(i)(C)).** The Interim Order provides that no costs or expenses of administration which have or may be incurred in the Chapter 11 Cases at any time (i) between the entry of the Interim Order and the Final Order, and (ii) subject to the entry of the Final Order, any time after the entry of the Final Order, shall be charged against the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, their respective claims or interests, the Collateral, the Pre-Petition Collateral and/or the Replacement Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Agent and First Lien Agent in their sole and absolute discretion, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, any DIP Lender, the First Lien Agent, or any First Lien Lender. Interim Order, ¶ 9.3.

- **Provisions Granting Postpetition Liens on Chapter 5 Actions (L.R. 4001-2(a)(i)(D)).** The Interim Order provides that the grant to the DIP Agent and DIP Lenders of liens on and security interests in Chapter 5 Actions to secure repayment of the DIP Obligations shall be subject to the entry of the Final Order. Interim Order, ¶ 2.1.1. In addition, the grant of the Pre-Petition Lender

Replacement Liens in the Chapter 5 Actions shall be subject to entry of the Final Order.  Interim Order, ¶¶ 2.4.2(a), 2.4.3(a), and 2.4.4(a).

- **Provisions Using Postpetition Loans from a Prepetition Secured Creditor to Pay Secured Creditor's Prepetition Debt (L.R. 4001-2(a)(i)(E)).**  The DIP Credit Agreement provides that funds in the Cerberus Sweep Account shall be used to pay first, the Existing Senior Obligations, and second, the DIP Obligations.  DIP Credit Agreement, § 5.03(a).

- **Payment of Committee's Professional Fees (L.R. 4001-2(a)(i)(F)).**  Following the delivery of a Carve Out Trigger Notice, the Carve Out Expenses includes: (a) the amount of the unpaid and outstanding reasonable Debtors' Professional Fees that are incurred from and after the delivery of a Carve Out Trigger Notice in an aggregate amount not in excess of $100,000; and (b) the amount of the unpaid and outstanding reasonable Committee's Professional Fees that are incurred from and after the delivery of a Carve Out Trigger Notice in an aggregate amount not in excess of $25,000. Interim Order, ¶ 2.3(e)-(f).

- **Consideration of the Equities of the Case Under Section 552(b)(1) (L.R. 4001-2(a)(i)(H)).**  The Interim Order provides that in no event shall the DIP Agent, any DIP Lender, First Lien Agent, or any First Lien Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral, Pre-Petition Collateral, or Replacement Collateral.  The DIP Agent, the DIP Lenders, the First Lien Agent, and the First Lien Lenders shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, the First Lien Agent, and the First Lien Lenders with respect to proceeds, products, offspring or profits of any of the Collateral, Pre-Petition Collateral, or Replacement Collateral.  Interim Order, ¶ 10.8.

## Basis for Relief

## I.   The Debtors' Prepetition Secured Indebtedness

13.   As of the Petition Date, the Debtors have prepetition secured obligations consisting primarily of:

(a)   $39.2 million outstanding under the First Lien Loan Documents (the "First Lien Credit Facility");

(b)   $85.0  million outstanding under the Second Lien Loan Documents (the "Second Lien Credit Facility"); and

(c)   $41.2 million outstanding under the Third Lien Loan Documents (the "Third Lien Credit Facility," and together with the First Lien Credit Facility, the Second

Lien Credit Facility, and accrued and unpaid interest, the "<u>Prepetition Debt Obligations</u>").

14.     The Pre-Petition Agents, as agents for the Pre-Petition Lenders, are party to a Subordination Agreement dated February 13, 2013 (as amended, supplemented or modified from time to time, the "<u>Subordination Agreement</u>"), which generally provides for the subordination of the claims, liens and security interests of the Second Lien Lenders and Third Lien Lenders to the claims, liens and security interests of the First Lien Lenders.  The Subordination Agreement also imposes certain limitations on: (a) the rights and remedies available to the Second Lien Lenders and Third Lien Lenders so long as obligations under the First Lien Loan Documents remain outstanding; and (b) the Second Lien Lenders' and Third Lien Lenders' ability to challenge or contest the validity or priority of liens arising under the First Lien Loan Documents.

**II.     Status of the Prepetition Secured Indebtedness**

15.     During 2013, the Debtors' passenger business continued to perform in line with expectations; however, the cargo business at World suffered and underperformed all projections. The Debtors continued to service their debt, making all scheduled interest installment payments on the First Lien Credit Facility and Second Lien Credit Facility.  In May 2013, the First Lien Agent informed the Debtors that they had violated financial covenants under the First Lien Credit Facility in conjunction with reporting the Debtors' consolidated April results.  Pursuant to certain intercreditor agreements, the Debtors have continued to make scheduled interest payments on the First Lien Credit Facility; however, they have not made any interest payments to the Second Lien Credit Facility since April 2013.  The Third Lien Credit Facility remains in PIK status, and thus no payments have been made under the Third Lien Credit Facility.

16.     Due to the declaration of default under the First Lien Credit Facility, the Debtors exercised all available remedies to cure the default, including the implementation of a number of

cost reduction programs such as parking underutilized aircraft, reducing variable and fixed headcount, negotiating restructured aircraft leases, and seeking additional financing to restructure the companies and provide additional working capital.

17.    In June 2013, it became clear that the Debtors would be unable to recover and improve their financial performance and would continue to violate a number of the financial covenant requirements in the First Lien Credit Facility.  As a result, the Debtors negotiated and entered into a forbearance agreement with the First Lien Agent (the "First Forbearance Agreement").  The forbearance period under the First Forbearance Agreement terminated July 31, 2013.  During the first forbearance period, the Debtors were not able to renegotiate more favorable terms to the First Lien Credit Facility to eliminate or modify the financial covenant requirements.  In addition, the Debtors were not successful in raising capital to refinance the First Lien Obligations.

18.    On July 31, 2013, Global Aviation, World, and North American entered into a second forbearance agreement with the First Lien Agent (the "Second Forbearance Agreement"). The forbearance period under the Second Forbearance Agreement was scheduled to terminate October 31, 2013.  The Second Forbearance Agreement required a $9,000,000 forbearance fee (the "Forbearance Fee") with $3,000,000 due on the first day of each of August, September and October, 2013.  The Forbearance Fee was capitalized and added to the outstanding principal amount of the First Lien Credit Facility.

19.    On October 16, 2013, the First Lien Agent provided notice to the Debtors that it considered the Second Forbearance Agreement in non-monetary default and the forbearance thereunder terminated.  The Debtors have not entered into a subsequent forbearance agreement

and therefore remain in default of the First Lien Credit Facility at the time of filing for bankruptcy protection.

### III.    The Debtors' Prepetition Restructuring Initiatives

20.    In the weeks leading up to the Petition Date, the Debtors have been engaged in constructive discussions with their prepetition secured creditors and have taken steps to prepare for a restructuring.   In July 2013, the Debtors hired Imperial to evaluate and implement a potential refinancing of existing debt or a sale transaction involving one or more of the Debtors' businesses.   In August 2013, Imperial contacted 112 parties (roughly split evenly between potential buyers and potential lenders) regarding the financial restructuring or sale opportunities.   Between August and mid-September 2013, the Debtors and Imperial worked to finalize non-disclosure agreements and conducted diligence with interested parties.   Ultimately, 30 parties executed non-disclosure agreements.   The Debtors received three non-binding letters of intent ("LOIs"):   (a) one for the acquisition of the entire company (which was subsequently withdrawn), (b) one for the acquisition of North American only, and (c) one that contemplated the purchase and amendment of the First Lien Credit Facility.   Each of the proposals was problematic in that they included aspects that could not be achieved outside of chapter 11 within the short timeframe available (such as delivery of the business on a debt-free basis), or did not provide sufficient funds to repay the First Lien Credit Facility in full.

21.    Recognizing that some prospective refinancing or sale transactions could only occur in chapter 11, the Debtors and Imperial also began a search for potential sources of DIP financing.   Naturally, the Debtors asked the First Lien Agent whether the First Lien Lenders would be willing to extend DIP financing in a chapter 11 case.   As part of the DIP financing discussions, the Debtors also asked the First Lien Agent whether the First Lien Lenders would agree to allow a priming DIP loan provided by a third party lender.   The First Lien Agent

advised the Debtors that the First Lien Lenders would not agree to a priming DIP facility.  Under the Intercreditor Agreement, the Second Lien Lenders and Third Lien Lenders are not permitted to provide a DIP loan that primes the First Lien Lenders or to which the First Lien Lenders have not otherwise agreed.

22.    In addition to their negotiations with the First Lien Agent, the Debtors and Imperial sought to obtain DIP financing from other sources.  During their efforts to identify potential DIP lenders, the Debtors received only two non-binding DIP financing term sheets from third parties.  These term sheets each proposed a DIP facility that would prime the existing first lien debt and required confirmation of a chapter 11 plan that is unlikely to gain the support of the First Lien Lenders.  The priming aspect of these proposals and the low likelihood of plan confirmation in the face of opposition from the First Lien Lenders made these proposals unworkable from the Debtors' perspective.

23.    In the course of the Debtors' and Imperial's efforts to seek out alternative financing, the Debtors gauged whether parties would be willing to provide postpetition financing on a non-superpriority, unsecured, or non-priming basis.  The Debtors and Imperial were unable to obtain financing, or even identify any indicative offers to provide such financing, on such terms.  In particular, the Debtors' significant prepetition secured debt precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior secured and superpriority basis.  Moreover, and in light of potential financiers' unwillingness to provide financing on a priming basis, the Debtors believe potential lenders were unwilling to engage in a protracted priming fight with the First Lien Lenders — particularly within the available timeframe — thus deterring such parties from submitting financing offers.

24.    The Debtors and their advisors considered a variety of potential transactions, including refinance and sale options.  Based on that diligence, the Debtors have determined that the DIP Facility presents the most viable mechanism for providing the liquidity that the Debtors require to continue their operations.  After careful consideration of the other proposals received, the Debtors concluded that the DIP Facility presents far less execution risk and delay, and allows the estates to avoid a costly, litigation-focused priming fight with the Prepetition Lenders.

25.    Based on all of the factors described herein, the Debtors deemed that it was in the best interests of their business to commence these Chapter 11 Cases and effectuate a comprehensive restructuring.

## IV.    The Proposed DIP Facility

### A.    Summary of Proposed DIP Facility

26.    After extended good faith, arm's-length negotiations, the First Lien Lenders, as proposed DIP Lenders, agreed to provide the DIP Facility on the terms provided in the DIP Loan Documents, which are summarized above.  The proceeds of the DIP Facility, which the Debtors estimate will be sufficient to finance these Chapter 11 Cases, will be used (a) for working capital and general corporate purposes of the Debtors and (b) to pay fees and expenses related to the DIP Credit Agreement and the Chapter 11 Cases.

27.    Importantly, the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Specific to these Chapter 11 Cases, the DIP Facility provides for certain milestones for the sale of the Debtors' assets.  Based on the extensive negotiations that took place, the Debtors believe that these are the only terms on which the DIP Lenders will provide the financing.  As the DIP Facility proceeds are necessary and the only financing available which avoids the value-destructive effects of a priming fight — i.e., the inevitable result of any alternative financing arrangement — the Debtors believe that sufficient

justification exists for agreeing to these provisions.  Moreover, the Debtors and their advisors understand that the DIP Lenders would not have been amenable to providing financing without these heavily bargained-for protections.

### B.    Use of Cash Collateral

28.    In addition to the DIP Facility, the Debtors require the continued use of their existing Cash Collateral.  The requisite prepetition secured parties have consented to the Debtors' continued use of Cash Collateral subject to the terms of the Interim Order.  In particular, the First Lien Lenders have agreed to the terms of the proposed use of Cash Collateral.  Given the consent of the First Lien Lenders, the Intercreditor Agreement provides that the Second Lien Lenders and Third Lien Lenders are deemed to have consented and have agreed not to raise any objection to the Debtors' use of Cash Collateral.  The Debtors therefore have the requisite consent to use Cash Collateral.

29.    The DIP Loan Documents ensure the Debtors' continued access to Cash Collateral.  Continued access to Cash Collateral will (a) ensure that the Debtors have access to sufficient working capital to, among other things, pay their employees, vendors, and suppliers, (b) enable the Debtors to continue honoring their prepetition obligations under and in accordance with other "first-day" orders entered by the Court, and (c) satisfy administrative expenses incurred in connection with the commencement of these Chapter 11 Cases.

### C.    Adequate Protection Package

30.    The Debtors and the Prepetition Lenders have agreed on the Adequate Protection Package described above that will adequately protect the Prepetition Lenders' interests in the Pre-Petition Collateral from diminution in value caused by the Debtors' use of the Cash Collateral, as well as for any decline in, or diminution of, the value of the Prepetition Lenders' liens or security interests under the Prepetition Facilities.

31.     In addition to the Adequate Protection Package itself, and as noted in the First Day Declaration, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of adequate protection.  Indeed, the Debtors' secured creditors will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent diminution of the value of the Pre-Petition Collateral and enhance the likelihood of preserving and maximizing the Debtors' overall going concern value.

**Supporting Authority**

I.     **The Debtors Should be Authorized to Obtain Postpetition Financing**

    A.     **Entering into the DIP Loan Documents is an Exercise of the Debtors' Sound Business Judgment**

32.     The Court should authorize the Debtors to enter into the DIP Loan Documents and obtain access to the DIP Facility and the Cash Collateral as an exercise of the Debtors' sound business judgment.

33.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("the applicable factors can be synthesized as follows: (1) That the proposed financing is an exercise of sound and reasonable business judgment . . . .").

34.    Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

35.    The Debtors' execution of the DIP Loan Documents is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs during the pendency of any chapter 11 case, and determined that the Debtors would require postpetition financing to support their operational and restructuring activities.  Accordingly, after extensive marketing efforts by the Debtors and their advisors, the Debtors negotiated the DIP Facility with the DIP Lenders in good faith, at arm's-length, and with the assistance of outside counsel, to obtain the required postpetition financing on terms favorable to the Debtors.

36.     The Debtors believe that the Court's consideration of non-economic factors, as permitted by *ION Media*, is especially appropriate here.   Absent the First Lien Lenders' willingness and ability to fund the DIP Facility, the Debtors potentially would face a prolonged and value-destructive priming fight with their existing lenders to the extent the Debtors sought to enter into alternative financing arrangements.   Moreover, as set forth in the First Day Declaration, it is unclear whether competing third party lenders would be in a position to provide as certain a financing arrangement as currently available under the DIP Facility.   The Debtors submit that the certainty afforded by the DIP Facility — with respect to both its consensual nature as well as the likelihood of closing and the DIP Lenders' support of the Debtors' restructuring efforts — provides additional and ample reason to authorize it.

37.     Accordingly, the Debtors and their advisors determined in their sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative.   As noted above, the DIP Facility will provide the Debtors with access to the necessary liquidity, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing operations and reorganization activities through the pendency of these Chapter 11 Cases.   Additionally, the DIP Facility provides the Debtors with access to existing Cash Collateral, which preserves the status quo and relieves the Debtors of the cost of borrowing additional amounts to replace that cash.   Thus, the Debtors submit that entering into the DIP Loan Documents constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

**B.      The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured, Priming and Superpriority Basis**

38.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.   Specifically,

section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and

a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

39.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor

need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re

Snowshoe Co.*) 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit

from every possible lender before concluding that such credit is unavailable." *Id.*; *see also

Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001)

(superpriority administrative expenses authorized where debtor could not obtain credit as an

administrative expense). When few lenders are likely to be able and willing to extend the

necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113

(Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117,

120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing

facility and holding that the debtor made reasonable efforts to satisfy the standards of section

364(c) where it approached four lending institutions, was rejected by two, and selected the more

favorable of the two offers it received).

40.     As described above and in the First Day Declaration, the Debtors and Imperial identified and solicited offers from numerous potential postpetition lenders other than the First Lien Lenders in the weeks prior to the Petition Date.  The Debtors received only two proposals for DIP financing from third parties— a predictable result given the First Lien Lenders' likely resistance to any attempt to prime their prepetition liens.  Notwithstanding the Debtors' efforts, the Debtors were simply unable to obtain sufficient, or any, postpetition financing in the form of unsecured credit, solely as an administrative expense, or by a junior lien.  The Debtors' significant secured debt precludes them from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis.

41.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets.  Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s);

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable

business judgment and in the best interest of the debtor's estate and its creditors; and

- whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008).

42.     Here, the Debtors seek authority to enter into the DIP Loan Documents, which will provide the DIP Lenders priming liens on the Collateral currently secured by the Pre-Petition Liens.

43.     The DIP Loan Documents satisfy each of these factors.  First, as described above and in the First Day Declaration, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the Debtors require the DIP Facility.  The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing.  No alternative financing at the favorable terms offered in the DIP Facility was available to the Debtors, and the Debtors are not able to obtain financing from the DIP Lenders other than financing secured by first priority priming liens.  In light of the likely disruptive effects of any priming fight against the Pre-Petition Lenders, as well as the Debtors' desire to administer these Chapter 11 Cases on a consensual basis, the Debtors determined that accessing the DIP Facility from the DIP Lenders would best maximize estate value.

44.     Second, the Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Facility and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute these Chapter 11 Cases, which will threaten the Debtors' significant going concern value.  Providing the Debtors with the liquidity necessary to preserve their going

concern value through the pendency of these Chapter 11 Cases is in the best interest of all stakeholders.

45.     Third, the terms of the DIP Loan Documents are reasonable and adequate to ensure the Debtors' ongoing ability to operate in chapter 11 and ultimately emerge as a stronger enterprise.  Indeed, the DIP Facility will provide the Debtors with immediate access to at least $36 million in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtors to maintain their operations and their relationships with key constituents during these Chapter 11 Cases.  Accordingly, the terms of the DIP Facility are reasonable and the DIP Loans and the Cash Collateral are sufficient to support the Debtors' operations and restructuring activities through the pendency of these Chapter 11 Cases.

46.     Fourth, the Debtors and the DIP Lenders negotiated the DIP Facility in good faith and at arm's-length, and the Debtors' entry into the DIP Loan Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors and other parties in interest.

47.     Finally, as described below, the Debtors will provide adequate protection for the Pre-Petition Lenders' liens on and security interests in the Pre-Petition Collateral as well as any decline in, or diminution of, the value of the Pre-Petition Lenders' liens or security interests under the Pre-Petition Loan Documents.

48.     Moreover, under the terms of the Subordination Agreement, the requisite Pre-Petition Lenders have consented to the terms of the DIP Facility.  In particular, the First Lien Lenders have consented to the terms of the DIP Facility subject to the terms and conditions of the Interim Order.  Pursuant to the Subordination Agreement, the Second Lien Lenders and Third

Lien Lenders are deemed to have consented to the terms of the DIP Facility and have agreed to be primed on the same basis as the First Lien Lenders.

49.     The Court should therefore (a) authorize the Debtors to provide the DIP Agent, on behalf of itself and the other DIP Lenders, senior liens on the Collateral as provided in section 364(d)(1) of the Bankruptcy Code; and (b) grant the DIP Obligations superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code.

### C.      The Interests of the Pre-Petition Lenders Are Adequately Protected

50.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B).  By requiring debtors to provide adequate protection to those creditors whose liens are being primed, the Bankruptcy Code seeks to protect a secured creditor from diminution in the value of its interest in the particular collateral.  *See In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539–40 (Bankr. D. Del. 1992) (secured creditor only entitled to adequate protection to the extent the collateral declined in value); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (if there is no diminution in the value of the secured creditor's collateral and the debtor can operate profitably postpetition, the secured creditor is adequately protected against the use of cash collateral); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization.").

51.     What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Monroe Park*, 17 B.R. 934 (D. Del. 1982) (concept of adequate protection requires a debtor to propose some form of relief that will preserve the secured creditor's interest

in collateral pending the outcome of the bankruptcy proceedings); *see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).

52.     Here, the Pre-Petition Lenders are adequately protected.  The adequate protection provided by the Adequate Protection Package is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.  Further, the requisite Pre-Petition Lenders have consented to the terms of the DIP Facility, including the Adequate Protection Package.  Accordingly, the Court should approve the Adequate Protection Package.

## II.    The Debtors Should be Authorized to Use the Cash Collateral

53.     The requisite Pre-Petition Lenders have consented to the Debtors' use of Cash Collateral under the terms of the DIP Loan Documents.  The Debtors submit that their request to use Cash Collateral complies with applicable Bankruptcy Code requirements.

54.     The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part, as follows:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

55.     Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party.  Alternatively, section 363(c)(2)(B) of the Bankruptcy Code permits the Bankruptcy Court, after notice and a hearing, to authorize a debtor in possession's use of cash collateral without the consent of the secured party so long as the use is consistent with the provisions of section 363 of the Bankruptcy Code.

56.    The Debtors have the requisite Pre-Petition Lenders' consent to use Cash Collateral subject to the terms and conditions set forth in the Interim Order.   The First Lien Agent, on behalf of the First Lien Lenders, has agreed to the terms of the DIP Loan Documents. In addition, given the consent of the First Lien Lenders, the Subordination Agreement provides that Second Lien Lenders and Third Lien Lenders are deemed not to oppose the Debtors' use of Cash Collateral and the proposed Adequate Protection Package.   Subordination Agreement, § 2.2.   Accordingly, because the Debtors have the requisite Pre-Petition Lenders' consent for the use of Cash Collateral under the DIP Loan Documents, the Debtors' use of Cash Collateral should be approved under section 363(c)(2)(A) of the Bankruptcy Code.

57.    Second, the Debtors' proposed adequate protection is consistent with the requirements of section 363 of the Bankruptcy Code and, therefore, the Debtors' use of Cash Collateral — in addition to the requisite Prepetition Lenders having consented to it — meets the standard for approval under section 363(c)(2)(B) of the Bankruptcy Code.   As described above, the Debtors are providing the Prepetition Lenders with the Adequate Protection Package, which is fair and reasonable, and adequately protects the Prepetition Lenders' interests in the collateral securing the Debtors' prepetition obligations from diminution during these Chapter 11 Cases, including by the Debtors' use of the Cash Collateral pursuant to the terms hereof.

58.    In addition to the Adequate Protection Package itself, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of "adequate protection." Indeed, the Debtors' secured creditors will inherently benefit from the Debtors' proposed use of the Cash Collateral which, as set forth in the First Day Declaration, will prevent avoidable diminution of the value of the Collateral and enhance the likelihood of increasing or preserving the Debtors' overall going concern value.   This in and of itself serves to provide such parties

"adequate protection" for Bankruptcy Code purposes. *Cf. 495 Cent. Park*, 136 B.R. at 631 (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *Sky Valley*, 100 B.R. at 114 ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989); *In re Salem Plaza Ass'n*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor). Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

## III.   The Terms of the DIP Facility are Reasonable

### A.   The Debtors Should be Authorized to Pay the Fees Associated with the DIP Facility

59.     As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their providing the DIP Facility. Specifically, the Debtors will pay to the DIP Lenders (a) a Closing Fee in an amount equal to 1.00% times the Total Revolving Credit Commitment payable on the Interim Facility Effective Date, (b) an Unused Line Fee that accrue at the rate per annum of 0.75% on the excess, if any, of $12,000,000 over the average principal amount of all Revolving Loans outstanding from time to time and shall be payable monthly in arrears on the first day of each month; and (c) an Audit and Collateral Monitoring Fee consisting of the out-of-pocket costs and reasonable expenses of any examiner and/or any third party appraisers and/or professionals employed by the DIP Agent payable on demand, all as more fully set forth in Section 2.06 of the DIP Credit Agreement.

60.     As explained in the First Day Declaration, the fees, taken together with the other provisions of the DIP Loan Documents, represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facility available.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their Chapter 11 Cases.  The Debtors believe that paying these fees to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors and other parties in interest.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Credit Agreement in connection with entering into those agreements.

### B.     Modification of the Automatic Stay Is Warranted

61.     The DIP Facility and the proposed Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lenders and First Lien Lenders to exercise, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the DIP Loan Documents), all rights and remedies provided for in the DIP Loan Documents, and to take various other actions without further order of or application to the Court.

62.     The Debtors believe that the provisions of the Interim Order permitting the DIP Lenders and First Lien Lenders to enforce remedies against the Collateral and terminate the DIP Facility are justified under the circumstances.  The Debtors and the DIP Lenders negotiated in good faith regarding the terms of the DIP Facility.  The DIP Lenders expressed concern regarding the inherent unpredictability of in-court chapter 11 proceedings and requested the notice terms described above as a condition to the DIP Facility.  The Debtors would be unable to fund these Chapter 11 Cases and ongoing operations without access to the DIP Facility and

wished to avoid costly and time-consuming contested financing or cash collateral proceedings at the outset of these Chapter 11 Cases. Accordingly, the Debtors agreed to the notice terms and submit that they are justified under the circumstances.

## IV. The DIP Lenders Should be Deemed Good Faith Lenders under Section 364(e) of the Bankruptcy Code

63.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

64.     As explained herein and in the First Day Declaration, the DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**V.      The Interim Order Complies with Local Rule 4001-2**

65.      Local Rule 4001-2 requires a debtor to disclose certain provisions of a proposed

form of order approving the debtor's use of cash collateral and justify the inclusion of such

provisions, including:

> (B) Provisions or findings of fact that bind the estate or other parties in interest
> with respect to the validity, perfection or amount of the secured creditor's
> prepetition lien or the waiver of claims against the secured creditor without first
> giving parties in interest at least seventy-five (75) days from the entry of the order
> and the creditors' committee, if formed, at least sixty (60) days from the date of
> its formation to investigate such matters;

> (C) Provisions that seek to waive, without notice, whatever rights the estate may
> have under 11 U.S.C. § 506(c);

> (D) Provisions that immediately grant to the prepetition secured creditor liens on
> the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547,
> 548 and 549;

> (E) Provisions that deem prepetition secured debt to be postpetition debt or that
> use postpetition loans from a prepetition secured creditor to pay part or all of that
> secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

> (F) Provisions that provide disparate treatment for the professionals retained by a
> creditors' committee from those professionals retained by the debtor with respect
> to a professional fee carve-out; . . . and

> (H) Provisions that seek to affect the Court's power to consider the equities of the
> case under 11 U.S.C. § 552(b)(1).

66.      As described above, the proposed Interim Order and DIP Credit Agreement

contains the foregoing types of provisions.  The justification for the provisions of the Interim

Order for which disclosure is required pursuant to Local Rule 4001-2 is the immediate and

critical need for this access to liquidity under the DIP Facility and use of Cash Collateral.  As

discussed above, absent access to the liquidity provided under the DIP Facility and use of Cash

Collateral, the Debtors will be unable to pay the expenses of their ongoing operations, including

payroll and amounts owed to vendors.  Accordingly, the facts and circumstances of this case justify the inclusion of the terms that require disclosure under Local Rule 4001-2.

## VI.    The Debtors Require Immediate Access to the Cash Collateral and DIP Facility

67.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  FED. R. BANKR. P. 4001(b)(2) and (c)(2).

68.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow up to $36,000,000 under the DIP Facility, is not granted promptly.  The Debtors believe that the commencement of these Chapter 11 Cases has already and will continue to significantly increase the demands on their free cash as a result of, among other things, the costs of administering these Chapter 11 Cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these Chapter 11 Cases. Indeed, as explained in the First Day Declaration, unless the Court approves the Debtors' interim access to the DIP Facility funds, there is a distinct possibility that the Debtors will run out of cash in the coming weeks.  Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, permit the orderly continuation of the operation of their business, to make payroll, and to satisfy other working capital and operation needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

69.    Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

**Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

70.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), or otherwise.

**Notice**

71.     The Debtors have provided notice of this Motion to: (a) the United States Trustee; (b) those parties listed on the consolidated list of creditors holding the thirty largest unsecured claims against the Debtors, as identified in their chapter 11 petitions; (c) counsel for the prepetition secured lenders; and (d) counsel for the DIP Lenders.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

72.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and the First Day Declaration, the Debtors respectfully request entry of the Interim Order granting the relief requested herein and such other relief as may be appropriate under the circumstances.

Dated: November 12, 2013

Respectfully submitted,

**POLSINELLI PC**

*/s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Fax: (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

-and-

**HAYNES AND BOONE, LLP**
Kenric D. Kattner (TX Bar No. 11108400)
(*Pro Hac Vice* Pending)
Henry Flores (TX Bar No. 00784062) (*Pro Hac Vice* Pending)
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Fax: (713) 547-2600
kenric.kattner@haynesboone.com
henry.flores@haynesboone.com

*Proposed Counsel to Debtors and Debtors in Possession*