# **EXHIBIT A**

POLSINELLI PC
Jason A. Nagi, Esq.
900 Third Avenue, 21st Floor
New York, New York 10022
Tele: 212.659.7300
Fax:  212.918.8989
Email:  jnagi@polsinelli.com

POLSINELLI PC
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
Email: cward@polsinelli.com
        jedelson@polsinelli.com

-and-

HAYNES AND BOONE, LLP
Henry Flores
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
Email: henry.flores@haynesboone.com

*PROPOSED COUNSEL TO THE DELAWARE
DEBTORS AND DEBTORS IN POSSESSION*

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **In re** | § | **Chapter 11** |
| | § | |
| **GLOBAL AVIATION HOLDINGS INC.**, *et al.*, | § | **Case No. 12-40783 (CEC)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |

## GLOBAL AVIATION HOLDINGS INC.'S EMERGENCY MOTION UNDER BANKRUPTCY RULE 1014(b)

Global Aviation Holdings Inc. and its affiliates as reorganized debtors in the above-captioned chapter 11 cases (collectively, "Global Aviation") file this Global Aviation's Emergency Motion Under Bankruptcy Rule 1014(b) (the "Motion"), and respectfully represent:

### BACKGROUND

1.      Global Aviation previously filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court on February 5, 2012 (the "Prior Bankruptcy"). This Court entered an order confirming Global Aviation's plan of reorganization (the "Plan") on December 10, 2012. The effective date of the Plan occurred on February 13, 2013 (the "Effective Date"). Following the Effective Date, the Prior Bankruptcy has been substantially administered.

2.      Following its reorganization in the Prior Bankruptcy, Global Aviation continued to encounter various financial and operational hurdles, including decreased demand for military cargo and passenger services resulting from government budget constraints. Specifically, cargo revenue from military flying decreased due to the unexpected cancellation of fixed buy missions by the United States Air Mobility Command ("AMC"). In addition, AMC recently and unexpectedly cancelled all expansion flying beginning December 1, 2013, which reduced planned revenue for 2013 by approximately $13 million and for 2014 by approximately $54 million and created significant over-capacity in the military charter cargo business. This reduction in revenue severely impacted Global Aviation's liquidity. As of June 2013, Global Aviation were in default under their first lien credit agreement. Despite numerous immediate cost-reducing efforts undertaken by Global Aviation, liquidity continued to rapidly deteriorate in 2013, requiring Global Aviation to restructure their operations and financial affairs.

3.      To facilitate a further restructuring of their businesses, on November 12, 2013,

Global Aviation filed for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11

Cases") in the United States Bankruptcy Court for the District of Delaware (the "Delaware

Court").  At the hearing on November 13, 2013, the Delaware Court declined to proceed with

considering certain "first day" matters on the basis that Bankruptcy Rule 1014(b) stays all

proceedings in the Chapter 11 Cases until a determination is made by this Court to allow them to

proceed.  Global Aviation requires emergency relief because the Delaware Court has scheduled a

hearing to further consider the first day matters in the Chapter 11 Cases at 12:30 p.m. Eastern

Time on November 14, 2013.  A copy of the agenda for the hearing in the Delaware Court is

attached hereto as Exhibit A.

## RELIEF REQUESTED

4.      Global Aviation requests entry of an Order lifting any stay, under Bankruptcy

Rule 1014(b), and authorizing Global Aviation to proceed with their Chapter 11 Cases in all

respects in the Delaware Court.

5.      Global Aviation filed the Chapter 11 Cases in Delaware because Global Aviation

exited bankruptcy with a confirmed plan of reorganization that has been consummated.  In

addition, Global Aviation can no longer satisfy the venue requirements to initiate new chapter 11

cases in this Court under 28 U.S.C. § 1408.  Accordingly, the Debtors did not believe it was

proper to initiate new chapter 11 cases in a jurisdiction without the proper venue, and therefore,

filed the Chapter 11 Cases in Delaware where the Debtors are incorporated and domiciled.

6.      As to the exit from bankruptcy, Global Aviation's operations and financial affairs

are no longer being administered under the supervision of this Court.  Moreover, there is very

little post-confirmation work that requires administration in this Court.  Specifically, the deadline

to object to claims expired on October 10, 2013.  Following the amendment of the Plan approved

by the Court on October 10, 2013 (Docket No. 1080), the funds in the General Unsecured Claims

Recovery Pool (as defined in the Plan) are being donated to American Bankruptcy Institute's

Anthony H.N. Schnelling Endowment Fund.  Accordingly, no distributions remain to be made to

general unsecured creditors in the Prior Bankruptcy.  Global Aviation believes that the Prior

Bankruptcy has been substantially administered.

7.      As to venue, Global Aviation submits that venue in the Eastern District of New

York is no longer proper.  In the course of the Prior Bankruptcy, North American Airlines shut

down its principal place of business and operations at JFK Airport in Jamaica, New York and

relocated such operations to Peachtree City, Georgia.  Also, Global Aviation has no principal

assets located in the Eastern District of New York that would make venue proper.  On the other

hand, venue is proper in the Delaware Court because each of the Global Aviation entities are

incorporated in Delaware and are therefore domiciled in Delaware.

8.      Unfortunately, the Debtors are in limbo—unable to move forward with first day

hearings in the Delaware Court and unable to initiate new chapter 11 cases in this court due to

lack of venue.  The Debtors need approval of their first day motions and will suffer immediate

and irreparable harm absent the ability to immediately proceed with the Chapter 11 Cases in the

Delaware Court.  A summary of the relief requested in the first day motions filed in the Delaware

Court is attached hereto as Exhibit B.  In particular, certain of Global Aviation's banks have

frozen bank accounts pending entry of an order in the Chapter 11 Cases authorizing Global

Aviation to maintain its current bank accounts.  Further, absent access to its proposed debtor-in-

possession financing, Global Aviation will lack the liquidity to pay critical operating expenses,

including payroll and amounts owed to vendors.  In short, absent authority to proceed with the

4

Chapter 11 Cases in the Delaware Court, Global Aviation will have to cease all operations immediately.

## NOTICE

The Debtors have provided notice of this Motion to: (a) counsel for the Debtors in the Prior Bankruptcy; (b) Alicia M. Leonhard and Marylou Martin of the United States Trustee for Region 2; (c) counsel for or representatives of any union in the Prior Bankruptcy; (d) counsel for the Unsecured Creditors' Committee in the Prior Bankruptcy; and (e) counsel for the Disbursing Agent for General Unsecured Claims under the Plan in the Prior Bankruptcy.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, for the reasons set forth herein, Global Aviation respectfully requests entry of an Order granting the relief requested herein and such other relief as may be appropriate under the circumstances.

Dated:  November 13, 2013
       New York, New York

Respectfully submitted,

**POLSINELLI PC**

By:    _/s/  Jason A. Nagi_____
       Jason A. Nagi (NY)
       900 Third Avenue, 21st Floor
       New York, New York 10022
       Telephone:  (212) 684-0199
       Facsimile:  (212) 684-0197
       jnagi@polsinelli.com

**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

-and-

**HAYNES AND BOONE, LLP**
Henry Flores
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
henry.flores@haynesboone.com

PROPOSED COUNSEL TO THE
DELAWARE DEBTORS AND DEBTORS IN
POSSESSION

Exhibit "A"

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| GLOBAL AVIATION HOLDINGS INC., ET AL.,[1] | § Case No. 13-12945 (MFW) |
| | § |
| Debtors. | § (Joint Administration Requested) |
| | § |

*SECOND AMENDED* NOTICE OF AGENDA OF MATTERS SCHEDULED FOR FIRST
DAY HEARING ON NOVEMBER 14, 2013 AT 12:30 P.M. (ET)

**VOLUNTARY PETITIONS**

1.   Global Aviation Holdings Inc.
2.   New ATA Investment Inc.
3.   New ATA Acquisition, Inc.
4.   World Air Holdings, Inc.
5.   World Airways, Inc.
6.   North American Airlines, Inc.
7.   Global Shared Services, Inc.

**MATTERS GOING FORWARD – FIRST DAY PLEADINGS**

8.   Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases [Docket No. 2; Filed: 11/12/2013]

9.   Motion of the Debtors to Authorize Debtors to (I) Prepare a Consolidated List of Creditors for the Mailing Matrix, (II) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, and (III) Mail Initial Notices [Docket No. 3; Filed: 11/12/2013]

10.   Motion of the Debtors for Entry of an Order Authorizing the Debtors to (I) Continue to Operate the Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Grant Administrative Claims and Perform Certain Intercompany Arrangements and Historical Practices [Docket No. 4; Filed: 11/12/2013]

11.   Motion of the Debtors for Entry of an Order Authorizing the Debtors to (I) Pay Certain Prepetition Wages, Other Compensation and Reimbursable Employee Expenses and (II) Continue Employee Benefits Program[Docket No. 5; Filed: 11/12/2013]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, include: Global Aviation Holdings Inc. (2196); Global Shared Services, Inc. (1692); New ATA Acquisition Inc. (1985); New ATA Investment Inc. (2109); North American Airlines, Inc. (8792); World Air Holdings, Inc. (1036); and World Airways, Inc. (8276).  The Debtors' corporate address is 101 World Drive, Peachtree City, Georgia 30269.

12.    Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Continue Prepetition Insurance Coverage and Related Practices and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers [Docket No. 6; Filed: 11/12/2013]

Response Received:    Informal response received from affected insurance company

Status:    A revised form of order will be presented at the hearing.  This matter will go forward.

13.    Motion of the Debtors for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services [Docket No. 7; Filed: 11/12/2013]

14.    Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Maintain and Administer Certain Customer and Industry Related Agreements and to Honor Prepetition Obligations Related Thereto [Docket No. 8; Filed: 11/12/2013]

15.    Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541 (I) Authorizing the Debtors to Pay Taxes and Fees and (II) Directing Financial Institutions to Honor and Process Related Checks and Transfers [Docket No. 9; Filed: 11/12/2013]

16.    Application for an Order Appointing Kurtzman Carson Consultants, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and LBR 2002-1(f) [Docket No. 11; Filed: 11/12/2013]

17.    Motion of the Debtors for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs [Docket No. 12; Filed: 11/12/2013]

18.    Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), 1107(a) and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtors to Pay Prepetition Obligations Owed to Foreign Creditors, (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers, and (II) Scheduling Final Hearing [Docket No. 13; Filed: 11/12/2013]

19.    Motion of the Debtors Pursuant to Section 105(a), 362, 363(b) and 553 of the Bankruptcy Code for Interim and Final Order (I) Authorizing Debtors to (A) Apply Prepetition Payments to Prepetition and Postpetition Obligations Under Fuel Supply Contracts, (B) Authorizing Debtors to Pay Prepetition Amounts Owed to Fuel Supply Parties, (C) Authorizing Debtors to Honor Perform, and Exercise Their Rights and Obligations Under Fuel Supply Arrangements and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers [Docket No. 15; Filed: 11/12/2013]

20. Motion of the Debtors for Entry of an Order Authorizing Rejection of Certain Aircraft and Engine Leases [Docket No. 16; Filed: 11/12/2013]

     Response Received:    Informal response received from GE Capital Aviation Service LLC

     Status:        The Debtors have agreed to adjourn this matter with respect to GE Capital Aviation Service LLC.  The remainder of the relief requested in the motion is going forward.

21. Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief [Docket No. 23; Filed: 11/12/2013]

**FIRST DAY DECLARATION**

22. Declaration of William A. Garrett, Executive Vice President and Chief Financial Officer of Global Aviation Holdings Inc., in Support of First Day Pleadings [Docket No. 24; Filed: 11/12/2013]

**MATTERS GOING OUT ON NOTICE**

23. Motion of the Debtors for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business [Docket 10; Filed: 11/12/2013]

24. Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b)(9) (I) Authorizing Debtors to Pay Certain Prepetition Claims of 503(b)(9) Claimants, Lien Claimants, and PACA Vendors, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers [Docket No. 14; Filed: 11/12/2013]

Dated:  November **13**, 2013
        Wilmington, Delaware

Respectfully submitted,

**POLSINELLI PC**

By:   /s/ *Justin K. Edelson*
      Christopher A. Ward (Del. Bar No. 3877)
      Justin K. Edelson (Del. Bar No. 5002)
      222 Delaware Avenue, Suite 1101
      Wilmington, Delaware 19801
      Telephone: (302) 252-0920
      Facsimile.: (302) 252-0921
      cward@polsinelli.com
      jedelson@polsinelli.com

                    -and-

**HAYNES AND BOONE, LLP**
Kenric D. Kattner (*Pro Hac Vice* Pending)
Henry Flores (*Pro Hac Vice* Pending)
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
kenric.kattner@haynesboone.com
henry.flores@haynesboone.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION

Exhibit "B"

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | § | **Chapter 11** |
| | § | |
| GLOBAL AVIATION HOLDINGS INC., ET AL.[1] | § | **Case No. 13-12945 (MFW)** |
| | § | |
| Debtors. | § | **(Joint Administration Requested)** |
| | § | |

## DECLARATION OF WILLIAM A. GARRETT, EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF GLOBAL AVIATION HOLDINGS INC. IN SUPPORT OF FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, I, William A. Garrett, hereby submit this declaration (the "Declaration") under penalty of perjury:

1.     I am the Executive Vice President and Chief Financial Officer of Global Aviation Holdings Inc. ("Holdings"), a corporation organized under the laws of the state of Delaware and a debtor and debtor in possession in the above-captioned cases of Holdings and certain of its affiliates as debtors and debtors in possession (collectively, "Global Aviation" or the "Debtors"). In such capacity, I am intimately familiar with Global Aviation's businesses, day-to-day operations and financial affairs.

2.     On the date hereof (the "Petition Date"), Global Aviation commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and filed the motions and applications described herein for related relief (collectively, the "First Day Pleadings"). Global Aviation is operating its business and managing its properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Global Aviation is not a small

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, include: Global Aviation Holdings Inc. (2196); Global Shared Services, Inc. (1692); New ATA Acquisition Inc. (1985); New ATA Investment Inc. (2109); North American Airlines, Inc. (8792); World Air Holdings, Inc. (1036); and World Airways, Inc. (8276).  The Debtors' corporate address is 101 World Drive, Peachtree City, Georgia 30269.

business within the meaning of section 101(51)(D) of the Bankruptcy Code.  Concurrently with the filing of this declaration, Global Aviation has requested procedural consolidation and joint administration of these chapter 11 cases (the "Chapter 11 Cases").

3.    I have reviewed and am familiar with the contents of each of the First Day Pleadings, and I believe that the approval of the relief requested therein is necessary to minimize disruption to Global Aviation's business operations so as to permit an effective transition into chapter 11, preserve and maximize the value of the Debtors' estates and, ultimately, achieve a successful reorganization.  I also believe that, absent immediate access to encumbered cash collateral and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as sought and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of the Debtors' estates.

4.    Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of Global Aviation's business operations, my review of relevant documents, information provided to me or verified by other executives or employees, Global Aviation's professional advisors, including Haynes and Boone, LLP ("Haynes and Boone") and Imperial Capital, LLC ("Imperial") and upon my experience, knowledge and information concerning Global Aviation's operations, financials and the charter airline industry generally. Unless otherwise indicated, the financial information contained in this Declaration is presented on a consolidated basis and is unaudited and subject to change.  I am authorized to submit this Declaration on behalf of Global Aviation, and if called upon to testify, I would testify competently to the facts set forth herein.

## Preliminary Statement

5.      The Debtors provide military, cargo, passenger and commercial charter air transportation services.  The Debtors operate their businesses through their two airlines: World Airways, Inc. ("World") and North American Airlines, Inc. ("North American").  World and North American are among the Debtors in these cases.

6.      The Debtors are the largest provider of private airlift services to the United States military through a diverse fleet offering both passenger and cargo services.  Holdings, through its two subsidiaries (North American and World), operates in three distinct lines of business: (a) Aircraft, Crew, Maintenance and Insurance ("ACMI") [2] passenger and cargo flying for commercial customers, (b) charter passenger and cargo flying for the United States military and other government agencies, and (c) full service flying for non-military charter customers.  North American utilizes medium-gauge, wide-body passenger aircraft (B767s), while World utilizes large-gauge, wide-body freighter aircraft (MD-11s and B747s) and passenger aircraft (MD-11s).

7.      Today, Global Aviation has come to be known as the gold standard in providing safe and high quality service to the United States military.  Additionally, Global Aviation has developed a reputation for safe and reliable commercial cargo and passenger services, which it provides to a broad customer base that includes major corporations, domestic and international airlines, logistics companies, presidential campaigns, sports teams, entertainers and production companies.  Notably, Global Aviation provided charter services for the presidential campaigns of President George W. Bush, Secretary of State Hillary Clinton and President Barack Obama and recently provided charter services for the Minnesota Vikings for their away game in London, England.

---

[2] World or North American are contracted to provide the aircraft, the flight crew, all maintenance and insurance required by the customer and related flight operation.  The customer is responsible for all other costs of the operation including fuel, aircraft handling, over flight and navigation.

8.    Each of the Debtors previously filed for protection under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York (the "EDNY Court") in February 2012 (the "Prior Bankruptcy").[3]  The Prior Bankruptcy was jointly administered as Case No. 12-40783.    The EDNY Court confirmed a plan of reorganization in the Prior Bankruptcy, which became effective on February 13, 2013.

9.    Global Aviation emerged from the Prior Bankruptcy with first lien exit financing of $30 million and second and third lien secured debt totaling $130 million.  After emerging from the Prior Bankruptcy, Global Aviation's business remained dependent on the needs of the military and certain key commercial cargo customers, and Global Aviation's business plan was heavily reliant on the continued military and world-wide cargo demands for World's large, wide-body freighter aircraft.  Throughout 2013, the United States military has continued to cut its demand for air cargo services offered by World, and on September 30th, the United States military unexpectedly announced significant additional curtailments of cargo flying effective December 1, 2013.  In addition, World's commercial cargo customers have canceled two key commercial cargo contracts and have reduced flying on the contracts that remain in place.  In the face of these dramatic and unexpected revenue reductions, the Debtors have announced significant layoffs, reduced other operating expenses, and attempted to secure additional costs savings on its aircraft leases and labor costs controlled under collective bargaining agreements.  Unfortunately, these efforts have not generated savings sufficient to produce positive and stable cash flows.

10.    Based on the challenges faced by Global Aviation, the management team, with the assistance of its advisors, has developed an achievable reorganization strategy that focuses on

---

[3] In addition to each of the Debtors, Global Aviation Ventures SPV LLC ("Ventures") and World Airways Parts Company, LLC ("Parts") were also debtors in the Prior Bankruptcy.  Ventures and Parts merged into the Debtors and no longer exist.

several key objectives to maximize the value of the Debtors' estates and address the issues that led to the commencement of these Chapter 11 Cases.  Specifically, this reorganization strategy focuses on:

- deleveraging the Debtors' balance sheet and establishing an appropriate capital structure;

- optimizing and rationalizing the Debtors' fleet by utilizing the Bankruptcy Code to reject certain unnecessary aircraft leases and securing other aircraft lease modifications; and

- reducing World's labor and fixed costs to support ongoing commercial and military air operations.

Through these initiatives, Global Aviation intends to emerge from chapter 11 on sound financial footing and with a stable and profitable mix of commercial, government and military business.

11.     To familiarize this Court with Global Aviation, its businesses and the initial relief sought by the Debtors to stabilize operations and facilitate their restructuring, this Declaration is organized as follows.  Section I provides an overview of Global Aviation's corporate history, prepetition organizational structure and capital structure.  Section II describes Global Aviation's current businesses and operations.  Section III describes the events and circumstances leading to the commencement of these Chapter 11 Cases.  Section IV describes the proposed DIP Facility (as defined below) to obtain the necessary liquidity for these Chapter 11 Cases.  Section V summarizes the relief requested in, and the facts supporting, each of the First Day Pleadings.

## **Statement of Venue**

12.     As discussed above, Global Aviation operates through its subsidiaries World and North American.  Corporate headquarters for both World and North American are located at 101 World Drive, Peachtree City, Georgia 30269-6965.

13.     All Debtors are incorporated in the State of Delaware.

### Background

**I.**    **Global Aviation's Pre-Petition Organizational and Capital Structure**

14.    Holdings is the direct or indirect parent company of all of the other Debtors, and one non-debtor entity, World Risk Solutions, Ltd.  Below is Global Aviation's organizational chart.



A.      **Global Aviation's Prior Chapter 11 Bankruptcy Proceeding**

15.      Global Aviation's debts were restructured during the Prior Bankruptcy, which allowed a restructuring of certain assets, aircraft leases and reduction in labor costs.

16.      The EDNY Court confirmed the Debtors' plan of reorganization on December 10, 2012 (the "2012 Plan").  On February 13, 2013, the 2012 Plan became effective.  Pursuant to the 2012 Plan, the holders of allowed general unsecured claims are to receive *pro rata* distributions from a dedicated fund in the amount of $250,000.  These funds were placed in a trust and the trustee continues to administer the trust assets, and the Prior Bankruptcy remains open for purposes of concluding distribution of the trust assets.

B.      **Summary of Global Aviation's Prepetition Capital Structure**

17.      As of October 31, 2013, Global Aviation's outstanding long-term debt obligations were in the aggregate principal amount of approximately $165.2 million.  The $165.2 million of long-term debt consists primarily of: (a) $39.0 million outstanding under the First Lien Financing Agreement dated as of February 13, 2013 (the "First Lien Credit Facility"); (b)  $85.0  million outstanding under the Second Lien Financing Agreement dated as of February 13, 2013 (the "Second Lien Credit Facility"); and (c) $41.2 million outstanding under the Third Lien Financing Agreement dated as of February 13, 2013 (the "Third  Lien Credit Facility," and together with the First Lien Credit Facility, the Second Lien Credit Facility, and accrued and unpaid interest, the "Prepetition Debt Obligations").  The chart below summarizes the Prepetition Debt Obligations; further details with respect to each of these debt obligations are provided below.

| Debt Obligation | Approximate Amount Outstanding October 31, 2013 | Maturity Date | Security Status |
|---|---|---|---|
| **First Lien Credit Facility** | $39 million (no accrued interest) | February 2016 | Secured |
| **Second Lien Credit Facility** | $90.1 million (including $5.1 million of accrued interest) | August 2017 | Secured |
| **Third Lien Credit Facility** | $41.1 million (no accrued interest) | February 2018 | Secured |

18.     As of the Petition Date, certain lenders under the Second and Third Lien Credit Facilities own approximately 66% of the outstanding shares of Holdings' common stock. Certain trusts owned by the labor unions (ALPA Trust and IBT Trust (as each is defined below)) own 25% of the outstanding shares of Holdings' common stock. Approximately 6.9% of Holdings' common stock is mainly held by members of Global Aviation's senior management team, and the remaining shares (approximately 3%) are held for stock appreciation rights. Holdings' equity is privately held.

### i.     The First Lien Credit Facility

19.     The First Lien Credit Facility was implemented by the execution of the First Lien Financing Agreement dated as of February 13, 2013 (the "First Lien Financing Agreement") by and among Holdings, North American and World (collectively, the "Borrowers"), New ATA Investment Inc., New ATA Acquisition Inc., World Air Holdings, Inc., Global Shared Services, Inc. (collectively, the "Guarantors"), the lenders (the "First Lien Lenders"), and Cerberus Business Finance, LLC as collateral agent and administrative Agent for the First Lien Lenders ("Cerberus"). Under the First Lien Financing Agreement, the Borrowers borrowed an initial principal amount of $30 million. The final maturity date on the First Lien Credit Facility is February 13, 2016. The payment obligations under the First Lien Credit Facility are secured by a

8

first-priority lien on substantially all of the Debtors' assets, including a pledge of 100% of the stock in all of the Debtors (except for Holdings) and 65% of the stock in non-debtor World Risk Solutions, Ltd.  The First Lien Credit Facility provides for quarterly payments in the amount of $750,000 beginning in 2014 and interest at the rate of 10% per annum, with a post-default interest rate of 12%.

ii.    **The Second Lien Credit Facility**

20.    On February 13, 2013, Holdings, World and North American entered into an $85 million Second Lien Credit Facility, which matures in July 2017.  The Second Lien Credit Facility is governed by a credit agreement, dated as of February 13, 2013, by and among Holdings, World and North American as borrowers, the other Debtors as guarantors, the lenders party thereto (the "Second Lien Lenders") and Wells Fargo Bank, National Association ("Wells Fargo") as administrative and collateral Agent (as amended, supplemented or modified from time to time, the "Second Lien Credit Agreement").  The payment obligations under the Second Lien Credit Facility are secured by a second-priority lien on substantially all of the Debtors' assets, including a pledge of 100% stock in all of the Debtors (except for Holdings) and 65% of non-debtor World Risk Solutions, Ltd.  The Second Lien Credit Agreement provides for quarterly payments and interest that accrues at a rate of 10% per annum, with a post-default interest rate of 12% (the interest in excess of 10% is paid in kind), and if the First Lien Credit Agreement is in default, all accrued interest under the Second Lien Credit Agreement is paid in kind status.  Pursuant to the terms of the Intercreditor Agreement (as defined below), the Second Lien Credit Agreement is subordinate to the First Lien Credit Agreement.

### iii.    The Third Lien Credit Facility

21.    On February 13, 2013, Holdings, World and North American entered into a $40 million Third Lien Credit Facility, which matures in February 2018.  The Third Lien Credit Facility is governed by a credit agreement, dated as of February 13, 2013, by and among Holdings, World and North American as borrowers, the other Debtors as guarantors, the lenders party thereto (the "Third Lien Lenders" and together with the Second Lien Lenders, the "Junior Lenders") and Wells Fargo as administrative and collateral Agent (as amended, supplemented or modified from time to time, the "Third Lien Credit Agreement").  The payment obligations under the Third Lien Credit Facility are secured by a third-priority lien on substantially all of the Debtors' assets, including a pledge of 100% stock in all of the Debtors (except for Holdings) and 65% of non-debtor World Risk Solutions, Ltd.  The Third Lien Credit Agreement provides for interest that accrues at a rate of 3% per annum, with a post-default interest rate of 5%; all interest is paid in kind.  Pursuant to the terms of the Intercreditor Agreement (as defined below), the Third Lien Credit Agreement is subordinate to the First Lien Credit Agreement.  In addition, pursuant to a separate Subordination Agreement, dated February 13, 2013, between Wells Fargo, as second lien agent, Well Fargo, as third lien agent, and Global Aviation, the Third Lien Credit Agreement is subordinate to the Second Lien Credit Agreement on similar terms to the subordination between the First Lien Lenders and the Second and Third Lien Lenders.

### iv.    The Intercreditor Agreement

22.    Cerberus, as agent for the First Lien Lenders, and Wells Fargo, as agent for the Second Lien Lenders and Third Lien Lenders, are party to a Subordination Agreement dated February 13, 2013 (as amended, supplemented or modified from time to time, the "Intercreditor Agreement"), which generally provides for the subordination of the claims, liens and security

interests of the Junior Lenders to the claims, liens and security interests of the First Lien Lenders. The Intercreditor Agreement also imposes certain limitations on: (a) the rights and remedies available to the Junior Lenders so long as obligations under the First Lien Credit Facility remains outstanding; and (b) the Junior Lenders' ability to challenge or contest the validity or priority of liens arising under the First Lien Credit Facility. The limitations on the rights of the Junior Lenders also include the inability to receive cash interest, contest the use of cash collateral or DIP financing from the First Lien Agent or contest the sale of assets supported by the First Lien Agent, to name a few.

## II.    Overview of Global Aviation's Business and Operations

23.    Global Aviation is a leading provider of non-scheduled passenger and cargo air transport services. Global Aviation provides its services through two operating airlines: World and North American. As of the Petition Date, the Debtors employ 1,040 employees (the "Employees"), approximately 624 of which (the "Union Employees") are covered by collective bargaining agreements ("CBAs").[4] In addition, approximately 953 of the 1,040 Employees are full-time Employees (crew at guarantee hours and non-crew Employees scheduled to work a minimum of forty (40) hours per week) and approximately 87 are part-time Employees (non-crew Employees scheduled to work less than forty (40) hours per week).

---

[4] World is a party with the International Brotherhood of Teamsters (the "IBT") to that certain Agreement between World Airways, Inc. and the International Brotherhood of Teamsters, Airline Division Representing the Cockpit Crewmembers Employed by World Airways, Inc. and that certain Agreement between World Airways, Inc. and Local 210 of the International Brotherhood of Teamsters Representing the Flight Attendants Employed by World Airways, Inc. World is also a party with the Transport Workers Union of America, AFL-CIO to that certain Agreement between World Airways, Inc. and the Transport Workers Union of America AFL-CIO on behalf of the Dispatchers in Service of World Airways, Inc. North American is a party with the Airline Pilots Association (the "ALPA") to that certain Collective Bargaining Agreement Between North American Airlines and the Airline Pilots Association Representing the Pilots of North American Airlines and that certain Agreement between North American Airlines and Local 210 of the International Brotherhood of Teamsters Representing the Flight Attendants Employed by North American Airlines.

24.     World was founded in 1948 and has been providing supplemental airlift services to the United States military since the Korean conflict in 1951.  World provides efficient cargo and passenger transport with its modern, wide-body fleet.  World operates eight (8) wide-body aircraft: four (4) MD-11 freighters, two (2) MD-11 passenger, and two (2) 747-400 freighter aircraft. World has an additional wide-body MD-11 freighter that is not currently in operation.

25.     North American was founded in 1989 and began flying passenger military missions in 1990.  North American operates five (5) 767-300 passenger aircraft.

26.     Global Aviation's combined aircraft fleet currently consists of 14 leased aircraft, which support Global Aviation's three primary business lines:

- **Military Passenger and Cargo Services**: Global Aviation, through its subsidiaries World and North American, is the largest provider of United States military passenger and cargo air transportation services.  Global Aviation is part of the Civil Reserve Air Fleet ("CRAF"), a program that falls under the Department of Defense, in which airlines provide aircraft to the United States government in a national emergency.  In return, the airlines receive entitlements to perform government contracts during peace time.

  Airlines participating in CRAF are often separated into teams based on their aircraft characteristics and capabilities.  Global Aviation is part of the "Alliance Team," which primarily services long-range international missions. Global Aviation's military revenues are derived from mission awards granted to Global Aviation pursuant to a contract with the Air Mobility Command (the "AMC").  The number of AMC missions Global Aviation is allotted depends on entitlements awarded for each aircraft that is committed by the Alliance Team members.  Global Aviation's contract with AMC represents the largest portion of its annual revenue.

- **Commercial Cargo Services**: Global Aviation operates commercial cargo air transport service for commercial cargo customers through World. World provides its commercial cargo services through two contract structures: (a) ACMI contracts, whereby World provides only the aircraft, crew, maintenance and insurance to a customer for a fee, and (b) full service contracts whereby World provides the aircraft, crew, maintenance, insurance, fuel, landing, ground handling and all other necessary operating services to a customer for an increased fee.

- **Commercial Passenger Services**: Both World and North American operate passenger charter services to customers in specialty markets, such as providing supplemental peak capacity for other air carriers, other government entities, corporations, political campaigns, professional sports teams, tour operators and concert tours. World and North American provide their passenger charter services through both ACMI and full service contracts.

27.     Global Aviation's cockpit crewmembers, flight attendants and dispatchers are represented by labor unions which are parties to certain collective bargaining agreements with certain of the Debtors.

- World's cockpit crewmembers and flight attendants, who account for approximately 38% and 30% of the total workforce at World, respectively, are represented by the IBT and are each subject to a separate collective bargaining agreement. Furthermore, North American's flight attendants, who account for approximately 39% of the total workforce at North American, are represented by the IBT and are subject to a separate collective bargaining agreement. The North American flight attendants' collective bargaining agreement has yet to be ratified.

- World's flight dispatchers located in Peachtree City, Georgia, are represented by The Transport Workers Union of America AFL-CIO and are subject to a separate collective bargaining agreement.

- North American's cockpit crewmembers, who account for approximately 31% of the total workforce at North American, are represented by ALPA and are subject to a separate collective bargaining agreement.

## III.     Events Leading to Chapter 11 and Prepetition Restructuring Initiatives

### A.     Events Leading to Chapter 11

28.     As discussed in detail above, Global Aviation has outstanding Prepetition Debt Obligations of approximately $165.2 million. Global Aviation's earnings before interest, taxes, depreciation and amortization ("EBITDA") have not substantially improved from the prior year. EBITDA for 2013 has declined substantially from the same period in 2012. For the nine months ending September 30, 2013, EBITDA was $7.1 million, as compared to the EBITDA for the same time period in 2012 at $19.1 million. In 2013, Global Aviation has seen a degradation of

EBITDA of $10.9 million as compared to 2012.  The EBITDA reduction is primarily due to lower revenue.  Revenue decreased from approximately $486 million in the nine months ending September 30, 2012 to approximately $354 million for the nine months ending September 30, 2013.  With earnings in this range, Global Aviation does not have the capacity to support $165.2 million of debt, nor the capacity to continue to operate customer contracts that are not clearly profitable.  Consequently, Global Aviation has engaged in extensive negotiations with its secured lenders and has continued to idle cargo aircraft that cannot produce positive cash contributions.  As a result of its inadequate financial performance, Global Aviation defaulted on its First Lien Credit Facility in May 2013.  Global Aviation's discussions with its secured lenders to cure that continuing default have resulted in both the First Forbearance Agreement and the Second Forbearance Agreement (as both terms are defined below).

29.     Post-restructuring, Global Aviation's passenger business continued to perform in line with expectations; however, the cargo business at World suffered and underperformed all projections as a result of worldwide softness in the air freight market.

30.     A series of critical events hampered Global Aviation's ability to implement its business plan with respect to the cargo business.  Despite a consistent level of military and commercial ACMI cargo flying throughout the fourth quarter of 2012 and at the start of 2013, as 2013 progressed, demand for both military and commercial ACMI cargo significantly deteriorated.  World's fleet of MD-11 and B747-400 freighters were not meeting planned utilization levels as a direct result of weakening customer demand for large, wide-body freighter aircraft.  For example, cancellation of a commercial ACMI contract in the first quarter of 2013 led World to park one MD-11 freighter in the second quarter of 2013, and another customer has significantly reduced utilization of one of its MD-11 freighter aircraft.  Overall, the deterioration

of World's military and commercial cargo revenue resulted in operating losses that significantly impaired Global Aviation's liquidity position.   Other changes in the AMC program have exacerbated the Debtors' problems.  In July 2013, AMC unexpectedly announced a reduction of fixed buy cargo flying in fiscal 2014.   Further, in late September 2013, AMC unexpectedly announced the cancellation of its cargo expansion flying effective December 1, 2013.   Because AMC cargo flying represents a large source of revenue for World, the loss of the military cargo business in both AMC's fixed and expansion buy were materially adverse events.  To compound matters further, AMC military cargo operations to the Middle East often result in revenue opportunities to contract spot market, full-service commercial cargo backhauls to the United States from the Far East.  The elimination of future AMC cargo expansion and fixed buy flying resulted directly in a parallel reduction in full-service commercial cargo backhaul opportunities described above.  As a result of these events in 2013, Global Aviation's cargo business missed its revenue projections by 22% (through September 30, 2013), excluding planned growth aircraft, which negatively affected the overall liquidity of Global Aviation.

31.    Further, though it attempted to reduce its overall cost footprint at all Global Aviation entities, the company's underutilized fixed cost structure, idle aircraft and restrictive and costly labor work rules all contributed to the deteriorating liquidity of the company.

**B.    Global Aviation's Decline in Liquidity**

32.    Post-restructuring, Global Aviation continued to service its debt, making all scheduled interest installment payments on the First Lien Credit Facility and Second Lien Credit Facility.  In May 2013, Global Aviation informed Cerberus that it had violated certain financial covenants under the First Lien Credit Facility in conjunction with reporting consolidated April results.   Pursuant to the Intercreditor Agreement, Global Aviation has continued to make

scheduled interest payments on the First Lien Credit Facility; however, it has not made, and it is not allowed to make any interest payments on the Second Lien Facility since April 2013. The Third Lien Credit Facility continues to accrue only PIK interest and thus no cash payments have been made under the Third Lien Credit Facility.

33.     Global Aviation exercised all available remedies to cure its default of the First Lien Credit Facility, including the implementation of a number of cost reduction programs such as parking underutilized aircraft, reducing variable and fixed headcount, negotiating restructured aircraft leases, and seeking additional financing to restructure the companies and provide additional working capital.

34.     In June 2013, it became clear that Global Aviation would be unable to recover and improve its financial performance and would continue to violate a number of the financial covenant requirements in the First Lien Credit Facility. As a result, Global Aviation negotiated and entered into a forbearance agreement with Cerberus, as administrative agent (the "First Forbearance Agreement"). The forbearance period under the First Forbearance Agreement terminated July 31, 2013. During the first forbearance period, Global Aviation was not able to renegotiate more favorable terms to the First Lien Credit Facility to eliminate or modify the financial covenant requirements. In addition, Global Aviation was not successful in raising capital to refinance the First Lien Credit Facility.

35.     On July 31, 2013, Holdings, World, and North American entered into a second forbearance agreement with Cerberus, as administrative agent (the "Second Forbearance Agreement"). The forbearance period under the Second Forbearance Agreement was scheduled to terminate October 31, 2013. The Second Forbearance Agreement required a $9,000,000 forbearance fee (the "Forbearance Fee") with $3,000,000 due on the first of each of August,

September, and October, 2013.   The Forbearance Fee was capitalized and added to the outstanding principal amount of the First Lien Credit Facility.

36.      On October 16, 2013, Cerberus, as administrative agent, provided notice to Holdings that Cerberus considered the Second Forbearance Agreement in non-monetary default and the forbearance thereunder terminated.   Global Aviation has not entered into a subsequent forbearance agreement and was in default of the First Lien Credit Agreement at the time of filing for bankruptcy protection.

### C.      Global Aviation's Prepetition Restructuring Initiatives

37.      In the weeks leading up to the Petition Date, Global Aviation has been engaged in constructive discussions with its prepetition secured creditors.   Importantly, the Debtors and the First Lien Lenders have agreed to the terms of a postpetition financing facility, giving the Debtors access to much needed liquidity to fund these Chapter 11 Cases.

38.      Global Aviation has taken steps to prepare for a restructuring.   In July 2013, Global Aviation hired Imperial to evaluate and implement a refinancing of existing debt or a sale transaction involving one or more of Global Aviation's businesses.   Imperial went out to the market in mid-August and contacted 112 parties regarding the refinancing or sale opportunities. Between August and mid-September 2013, Global Aviation and Imperial worked to finalize non-disclosure agreements and conducted diligence with interested parties.   Ultimately, 30 parties executed non-disclosure agreements.   Global Aviation received three non-binding letters of intent ("LOIs"):   (a) one for the acquisition of the entire company, (b) one for the acquisition of North American only, and (c) one that contemplated the purchase and amendment of the First Lien Credit Facility.   Each of the proposals was problematic in that they included aspects that could not be achieved outside of chapter 11 within the short time-frame available (such as

delivery of the business on a debt-free basis), or did not provide sufficient funds to repay the First Lien Credit Facility in full.

39.     Recognizing that some prospective refinancing or sale transactions could only occur in chapter 11, Global Aviation and Imperial also began a search for potential sources of debtor-in-possession ("DIP") financing.  Naturally, Global Aviation asked Cerberus (as agent under the First Lien Credit Facility) whether the First Lien Lenders would be willing to extend DIP financing in a chapter 11 case.  As part of the DIP financing discussions, the Debtors also asked Cerberus whether the First Lien Lenders would agree to allow a priming DIP loan provided by a third party lender.  As agent, Cerberus advised the Debtors that the First Lien Lenders would not agree to a priming DIP facility.  Under the Intercreditor Agreement, the Second Lien Lenders and Third Lien Lenders are not permitted to provide a DIP loan that primes the First Lien Lenders or to which the First Lien Lenders have not otherwise agreed.  Shortly before the Petition Date, the Debtors and Cerberus agreed to the terms of a DIP financing facility (the "DIP Facility").

40.     In addition to their negotiations with Cerberus, the Debtors and Imperial sought to obtain DIP financing from other sources.  During their efforts to identify potential DIP lenders, the Debtors received only two non-binding DIP financing term sheets from third parties.  These term sheets each proposed a DIP facility that would prime the existing first lien debt and required confirmation of a chapter 11 plan that is unlikely to gain the support of the First Lien Lenders. The priming aspect of these proposals and the low likelihood of plan confirmation in the face of opposition from the First Lien Lenders made these proposals unworkable from the Debtors' perspective.

41.    In the course of the Debtors' and Imperial's efforts to seek out alternative financing, the Debtors gauged whether parties would be willing to provide post-petition financing on a non-superpriority, unsecured, or non-priming basis.  The Debtors and Imperial were unable to obtain financing, or even identify any indicative offers to provide such financing, on such terms.  In particular, I believe that the Debtors' significant prepetition secured debt precludes them from obtaining post-petition financing in the amount they require on terms other than on a senior secured and superpriority basis.  Moreover, and in light of potential financiers' unwillingness to provide financing on a non-priming basis, I believe that potential lenders were unwilling to engage in a protracted priming fight with the First Lien Lenders—particularly within the available timeframe and the Debtors' limited liquidity—thus deterring such parties from submitting financing offers.

42.    The Debtors and their advisors considered a variety of potential transactions, including refinancing and sale options.  Based on that diligence, the Debtors have determined that the DIP Facility presents the most viable mechanism for providing the liquidity that the Debtors require to continue their operations.  After careful consideration of the two other proposals received, the Debtors concluded that the DIP Facility presents far less execution risk and delay, and allows the estates to avoid a costly, litigation-focused priming fight with the First Lien Lenders.

43.    Based on all of the factors described herein, Global Aviation deemed that it was in the best interests of the business to commence these Chapter 11 Cases and effectuate a comprehensive restructuring.

IV.     **The DIP Facility**

A.     **The DIP Facility Terms are Fair and Reasonable**

44.     Prior to filing these Chapter 11 Cases, the Debtors and Cerberus Business Finance, LLC, in its capacities as administrative agent and collateral agent (in such capacities, collectively, the "<u>DIP Agent</u>") on behalf of the lenders party from time to time under that certain revolving debtor-in-possession credit facility entitled "Financing Agreement" dated as of November 13, 2013 (the "<u>DIP Lenders</u>"), negotiated the terms of the DIP Facility.  These arm's length negotiations culminated in the DIP Facility.   The DIP Facility provides a total revolving credit commitment of $52 million, and it allows the Debtors to borrow up to $36 million on an interim basis.  The terms of the DIP Facility are documented in a credit agreement (the "<u>DIP Credit Agreement</u>").   The DIP Credit Agreement permits the Debtors to obtain funding for expenditures in accordance with an approved budget (the "<u>Budget</u>").    The Budget is attached hereto as **<u>Exhibit B</u>**.

45.     The proceeds of the DIP Facility are sized to support the Debtors through the anticipated pendency of these Chapter 11 Cases.  Moreover, I believe that the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Specific to these Chapter 11 Cases, the DIP Facility sets certain milestones for the sale of the Debtors' assets and entitles the DIP Lenders to certain fees.  Based on the negotiations that took place, I believe that these are the only terms on which the DIP Lenders will provide the financing.

46.     It is my further understanding that any alternative financing arrangement, including an arrangement provided by other potential DIP lenders, likely would have led to a lengthy and potentially value-destructive priming fight.  Moreover, I understand that the DIP Lenders would not have been amenable to providing financing without these heavily bargained-

for provisions.  In the course of negotiations with the DIP Lenders, the Debtors explored whether the DIP Lenders would provide the DIP Facility with lower or no associated fees and free from procedural milestones.  The DIP Lenders made clear that they would not be willing to provide the DIP Facility on more favorable terms.

47.       The Debtors and the DIP Lenders engaged in discussions immediately prior to the Petition Date concerning certain provisions, including a roll-up of prepetition debt.  I believe that the terms of the DIP Loan Documents, including the provisions described above, constitute, on the whole, the most favorable terms the Debtors could achieve on which the DIP Lenders will extend the necessary postpetition financing.  Although the Debtors explored whether the DIP Lenders would provide the DIP Facility without such provisions, in the course of negotiations, the DIP Lenders indicated they would not be willing to provide the DIP Facility without such terms.  In particular, it is my understanding that the proposed roll-up provision is a key component of consideration for the DIP Lenders without which they have indicated they are unwilling to provide the DIP Facility.  Accordingly, the Debtors, Imperial, and the Debtors' other advisors—recognizing the absence of favorable competing proposals and the benefits to be provided under the DIP Facility—determined in their sound business judgment that the terms of the DIP Credit Agreement were and remain superior to any other set of terms reasonably available to the Debtors at this time.

48.       I believe that the DIP Facility provides the Debtors with the best, most feasible and most value-maximizing financing option available at this time.

**B.       The Terms of Continued Cash Collateral Use are Fair and Reasonable**

49.       In addition to the DIP Facility, the Debtors require the continued use of their existing Cash Collateral.  Accordingly, the requisite prepetition secured parties have consented to

the Debtors' continued use of Cash Collateral subject to the terms of the Interim Order.  In particular, the First Lien Lenders have agreed to the terms of the proposed use of Cash Collateral.  Given the consent of the First Lien Lenders, the Intercreditor Agreement provides that the Second Lien Lenders and Third Lien Lenders are deemed to have consented and have agreed not to raise any objection to the Debtors' use of Cash Collateral.  The Debtors therefore have the requisite consent to use Cash Collateral.

50.    I believe that continued access to Cash Collateral will (a) ensure that the Debtors have access to sufficient working capital to, among other things, pay their employees, vendors, and suppliers, (b) enable the Debtors to continue honoring their prepetition obligations under and in accordance with other "first-day" orders entered by the Court, and (c) satisfy administrative expenses incurred in connection with the commencement of these Chapter 11 Cases.

### C.    The Superpriority Claims and Priming Liens Are Justified Under the Circumstances

51.    In the course of the Debtors' and Imperial's efforts to seek out alternative financing, the Debtors gauged whether parties would be willing to provide postpetition financing on a non-superpriority, unsecured, or non-priming basis.  The Debtors and Imperial were unable to obtain financing, or even indicative offers to provide such financing, on such terms.  In particular, I believe that the Debtors' significant prepetition secured debt precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior secured and superpriority basis.  Moreover, and in light of potential financiers' unwillingness to provide financing on a non-priming basis, I believe that potential lenders were unwilling to engage in a protracted priming fight with the First Lien Lenders — particularly within the available timeframe — thus deterring such parties from submitting financing offers.

22

52.     In light of the likely disruptive effects of any priming fight, as well as the Debtors' desire to administer these cases on a consensual basis, I believe that entering into the DIP Facility with the DIP Lenders best maximizes estate value at this time and therefore supports authorization and approval of the priming liens and superpriority claims contemplated in the Interim Order.

### D.     The DIP Facility was Negotiated in Good Faith

53.     The Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Lenders offered the most viable option for obtaining the postpetition financing the Debtors require.  I believe that the DIP Credit Agreement is the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to timely obtain needed postpetition financing, and of arm's length, good faith negotiations between the Debtors and the DIP Lenders.

### E.     The Debtors Require Immediate Access to the Cash Collateral and the DIP Facility

54.     I believe that the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted, including authorizing the Debtors' use of Cash Collateral and borrowings of $36 million on an interim basis under the DIP Credit Agreement.  I further believe that the commencement of these Chapter 11 Cases will significantly increase demands on the Debtors' free cash as a result of, among other things, the costs of administering these Chapter 11 cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations.

55.     Without Court approval of the DIP Facility, the Debtors will not have sufficient cash to make timely payments to vendors and employees that are required to support flight operations around the globe.  Failure to pay these expenses would result in immediate cessation

of the Debtor's operations.  The Debtors' ability to finance their operations and the availability to the Debtors of sufficient working capital and liquidity through the DIP Facility is vital to the confidence of the Debtors' employees, suppliers and customers and to the preservation and maintenance of the going-concern value of the Debtors' estates.  The Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships with aircraft and equipment lessors, vendors, suppliers and customers, pay employees and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful reorganization.  Based on these circumstances, the Debtors require the interim funding provided by the DIP Facility to avoid immediate and irreparable harm to their operations, businesses and estates.

## V.    First Day Pleadings

56.    The Debtors have contemporaneously filed a number of First Day Pleadings seeking relief intended to allow the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their ongoing business operations and to promote a smooth transition to operations in chapter 11.  The First Day Pleadings seek authority to, among other things, preserve vendor and customer relationships, access funding under the DIP Facility, maintain employee morale and ensure the continuation of the Company's cash management systems and other business operations without interruption.  Court approval of the relief requested in the First Day Pleadings is essential to providing the Debtors with an opportunity to successfully restructure the Debtors' business in a manner that benefits all of the Debtors' constituents.

24

57.     I have reviewed each of the First Day Pleadings.  The facts stated therein and the description of the relief requested and the facts supporting each pleading attached hereto as **Exhibit A** are true and correct, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' business.

## Conclusion

58.     To minimize any loss of value to their business, the Debtors' immediate objective is to engage in business as usual following the commencement of these Chapter 11 Cases with as minimal interruption to the Debtors' operations as possible.  I believe that if this Court grants the relief requested in the First Day Pleadings, the prospect of achieving these objectives—to the maximum benefit of the Debtors' estates, creditors and parties in interest—will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing *Declaration of William A. Garrett, Executive Vice President and Chief Financial Officer of Global Aviation Holdings Inc. in Support of First Day Pleadings* is true and correct.

Dated: 11/12/2013

By: _____

Name: William A. Garrett

Title:  Executive Vice President and Chief
Financial Officer
Global Aviation Holdings Inc.

## Exhibit A

**Summary of First Day Pleadings**

## THE DEBTORS' FIRST DAY PLEADINGS

As explained in my declaration, the Debtors have requested a variety of relief in various "first day" motions and applications (each, a "First Day Pleading" and, collectively, the "First Day Pleadings")[1] to minimize the adverse effects of the commencement of these Chapter 11 Cases on their businesses and to ensure that their restructuring goals can be implemented with limited disruption to operations.  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to use cash collateral, make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.

In my opinion, approval of the relief requested in the First Day Pleadings, each of which is explained herein, will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

## ADMINISTRATIVE MOTIONS

**I.      Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion")**

1.      The Debtors operate as an integrated business with common ownership and control.  Global Aviation is the direct or indirect parent of each of the other six (6) Debtors.  Additionally, each of the seven (7) affiliated Debtor entities is directly liable for, or a guarantor of, the approximately $165 million in outstanding secured funded debt obligations that the

---

[1] Capitalized terms used in this Exhibit A but not otherwise defined shall have the meanings ascribed to such terms in the applicable first day pleadings.

Debtors seek to restructure as part of the Chapter 11 Cases. As a result, many of the motions, hearings and orders that will arise in the Chapter 11 Cases will affect each and every Debtor.

2. Additionally, I believe joint administration of the Chapter 11 Cases will provide significant administrative convenience and that entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration will also allow all parties to monitor the Chapter 11 Cases with greater ease and efficiency.

3. I do not believe that joint administration will give rise to any conflict of interest among the Debtors' estates, nor will joint administration adversely affect the Debtors' respective constituencies because this motion requests only administrative, not substantive, consolidation of the Debtors' cases. I do not believe that parties in interest will be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of the Chapter 11 Cases. Therefore, on behalf of the Debtors, I respectfully request that the Court grant the Joint Administration Motion.

## II. Motion of the Debtors for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedules and SOFA Motion")

4. The Debtors are requesting entry of an order granting additional time to file their Schedules and Statements for an additional thirty (30) days. The Debtors operate an international cargo and passenger air transportation service with thousands of potential creditors. Further, the nature and scope of the Debtors' international operations require them to maintain voluminous records and intricate accounting systems. I believe that the complexity of the Debtors' businesses, the limited staff available to perform the required internal review of their financial records and affairs, the numerous critical operational matters that their accounting and

legal personnel must address in the early days of the Chapter 11 Cases, the pressure incident to the commencement of the Chapter 11 Cases, and the fact that certain prepetition invoices have not yet been received or entered into their accounting systems provide ample cause justifying, if not necessitating, a thirty (30) day extension of the deadline to file the Schedules and Statements.

5.      I believe that the relief requested in the Schedules and SOFA Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and SOFA Motion should be approved.

**III.    Application of the Debtors for the Entry of an Order Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent for the Debtors (the "<u>KCC Retention Application</u>")**

6.      The Debtors believe that they may have more than 8,000 potential creditors.  To alleviate the heavy administrative burden on the clerk of the court, the Debtors seek to retain KCC as claims and noticing agent in these Chapter 11 Cases.  It is my understanding that KCC has substantial experience in matters of this size and complexity and has acted as the official claims and noticing agent in many large bankruptcy cases.  I believe that KCC is fully equipped to manage claims issues and provide notice to creditors and other interested parties in these Chapter 11 Cases and, therefore, on behalf of the Debtors, I respectfully submit that the KCC Retention Application should be approved.

**IV.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to (I) Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, (II) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors and (III) Mail Initial Notices (the "<u>Creditor Matrix Motion</u>")**

7.      If the KCC Retention Application is granted, pursuant to the Creditor Matrix Motion, KCC will (i) assist with the consolidation of the Debtors' computer records into a

3

creditor and security holder database and (ii) undertake all mailings directed by this Court, the

U.S. Trustee, or as required by the Bankruptcy Code, including, without limitation, the notice of

commencement of these Chapter 11 Cases.   Additionally, pursuant to the Creditor Matrix

Motion, the Debtors seek the authority to file a consolidated list of the Debtors' creditors holding

the thirty (30) largest unsecured claims.

8.      The Debtors have identified approximately 8,000 entities or individuals to which

notice of certain proceedings in the Chapter 11 Cases must be provided.   The Debtors presently

maintain various computerized lists of the names and addresses of their respective creditors that

are entitled to receive notices and other documents in the Chapter 11 Cases.   I believe that

consolidation of the information maintained in these computer files will enable KCC to use the

information efficiently to provide interested parties with notices and other similar documents.

Additionally, allowing KCC to assist with mailing and preparation of creditor lists and notices

will ease administrative burdens that otherwise would fall upon this Court and the U.S. Trustee.

Furthermore, I believe allowing the Debtors to file a single, consolidated list of the Debtors' 30

largest unsecured, non-insider creditors will promote efficiency because of the extensive overlap

that would occur among each individual Debtor.   Accordingly, in order to maximize efficiency

and accuracy and reduce costs, on behalf of the Debtors, I respectfully submit that the Creditor

Matrix Motion should be approved.

## OPERATIONAL MOTIONS

**V.      Motion of the Debtors for Entry of an Order Authorizing the Debtors to (i) Continue
to Operate the Cash Management System, (ii) Honor Certain Prepetition Obligations
Related Thereto, (iii) Maintain Existing Business Forms, and (iv) Grant
Administrative Claims and Perform Certain Intercompany Arrangements and
Historical Practices (the "Cash Management Motion")**

9.      The Debtors request entry of an order authorizing the Debtors to (a) continue to

operate their Cash Management System, (b) honor certain prepetition obligations related thereto,

(c) maintain existing business forms, and (d) grant administrative priority for intercompany claims and continue to perform intercompany arrangements and historical practices.

10.     The Debtors use their Cash Management System to collect, transfer and disburse funds generated from their operations, facilitate cash monitoring, forecasting and reporting, and to enable the Debtors to maintain control over the Bank Accounts located at the various Banks where five of the Debtors maintain accounts.[2]

11.     The Debtors' Cash Management System consists of approximately 34 Bank Accounts maintained at three different Banks.  The Cash Management System is managed from the Debtors' offices in Peachtree City, Georgia and serves as a conduit for revenue obtained from business operations for distribution to employees, vendors, and other creditors.

12.     The Debtors have designed the Cash Management System to meet their operating needs, enable them to centrally control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances.  The Cash Management System further provides the Debtors with the ability to quickly create status reports on the location and amount of funds, thereby allowing management to track and control such funds.  These controls are crucial given the significant volume of cash transactions managed through the Cash Management System on a daily basis.  Additionally, in contemplation of the commencement of these Chapter 11 Cases, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department and this Court.

---

[2] A list of the Debtors' Bank Accounts and the Banks at which they are maintained is attached as <u>Exhibit B</u> to the Cash Management Motion.

13.    The Debtors also maintain various Letters of Credit issued and outstanding as of the Petition Date, and held by certain commercial counterparties.[3]  As collateral for the Letters of Credit, the Debtors have Deposits with Wells Fargo Bank, N.A. ("Wells Fargo"), the issuer.  The Letters of Credit are important to maintaining the Debtors' relationships with the holders.  The Debtors post the Letters of Credit with respect to, among other things, certain taxes and fees, certain insurance obligations, certain airport obligations, and certain base obligations.  The Debtors' Letters of Credit support operations at various airports and ports where the Debtors operate, support the Debtors' leases of the buildings where they maintain their headquarters, are posted for potential tax indemnification claims, and are used in connection with the Debtors' workers' compensation programs.  The Debtors seek to continue the Letters of Credit and maintain the Deposits with Wells Fargo as security therefor.

14.    Furthermore, in the ordinary course, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate Bank Accounts, certain service charges and other fees, costs and expenses (collectively, the "Bank Fees").  The Debtors are seeking authority to continue to pay the Bank Fees in the ordinary course.

15.    As part of the Cash Management System, the Debtors maintain approximately 1,000 business and travel related employee credit cards (collectively, the "Corporate Credit Card Program") through Wells Fargo.  In addition, the Debtors' pilots are provided with checks (the "Captains' Checks") for use in locations where the employee credit cards may not be accepted, such as Ghana and Nigeria.  The Debtors prepay the amounts incurred on the Corporate Credit Card Program and Captains' Checks on a weekly basis.  In addition to the prepayments, the Debtors also maintain a $2 million deposit posted as collateral for their obligations to Wells Fargo under the Corporate Credit Card Program.  The Debtors are seeking authority to continue

---

[3] A list of the Debtors' Letters of Credit is attached as Exhibit D to the Cash Management Motion.

to honor their obligations under the Corporate Credit Card Program as they become due, and to maintain their deposits under the Corporate Credit Card Program as collateral to secure the obligations to Wells Fargo under the Corporate Credit Card Program whether prepetition or postpetition.

16.    In the ordinary course of business, certain of the Debtor entities maintain business relationships with each other and with World Risk Solutions, Ltd., a non-debtor affiliate and captive insurance company, resulting in intercompany receivables and payables (collectively, the "Intercompany Claims").  The Intercompany Claims reflect costs and revenues, all of which are allocated among the appropriate Debtor entities, resulting in Intercompany Claims.  As funds are disbursed throughout the Cash Management System, there may be, at any given time, Intercompany Claims owed among Debtor and non-debtor entities in connection with the disbursement of funds (the "Intercompany Transactions").  Further, the Intercompany Claims include claims arising from shared management agreements and subservice agreements by and between certain Debtors.  Under the shared management agreements, Global Aviation and Global Shared Services, Inc. provide management and operational support services to North American and World in exchange for management fees.  To ensure each individual Debtor will not permanently fund the operations of any affiliated entity, the Debtors are seeking to accord administrative expense priority to all Intercompany Claims against a Debtor by another Debtor or non-debtor affiliate arising after the Petition Date as a result of ordinary course Intercompany Transactions.

17.    I believe that discontinuation of the Intercompany Transactions would disrupt the Cash Management System and related administrative controls to the Debtors' detriment because

the Debtors would no longer be able to properly allocate costs and fees among the Debtor entities.

18.    In the ordinary course of business, the Debtors use a variety of checks and business forms.  To minimize expenses to their estates and avoid unnecessarily confusing their employees, customers, and suppliers, I believe it is appropriate to continue to use all correspondence and business forms (including letterhead, purchase orders, and invoices) as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

19.    I believe that the Debtors' businesses and financial affairs are complex, requiring the collection, disbursement, and movement of funds through numerous accounts.  Thus, to ensure the seamless operation of their international enterprise, I believe that the Debtors should be allowed to continue their well-managed Cash Management System rather than opening new bank accounts.

20.    Given the complex nature of the Debtors' businesses, I believe that a successful reorganization of the Debtors' businesses, as well as the preservation and enhancement of the Debtors' value as a going concern, simply cannot be achieved if the Debtors' Cash Management System is disrupted and their Bank Accounts are closed.

21.    If the Debtors were required to open new accounts as debtors in possession and modify the Cash Management System, the Debtors would be forced to reconstruct their Cash Management System.  Thus, the Debtors' treasury, accounting, and bookkeeping employees would need to focus their efforts on immediately opening new bank accounts and working with each project to ensure proper controls are in place for cash to properly flow through all

operations, thereby diverting daily responsibilities during this critical juncture of the Debtors' Chapter 11 Cases. The opening of new bank accounts would increase operating costs, and the delays that would result from opening new accounts, revising cash management procedures and instructing customers to redirect payments would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

22.    I believe that the Debtors' continued use of the Cash Management System will greatly facilitate their transition into these Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition debts. Further, I believe that parties in interest will not be harmed by the Debtors' maintenance of the existing Cash Management System, including their Bank Accounts. Specifically, with the assistance of their professionals, the Debtors have implemented internal protocols that prohibit payments on account of prepetition debts, including prepetition accounts payable payments and prepetition intercompany debts, without the prior approval of their treasury department and this Court. In light of such protective measures, I believe that maintaining the Cash Management System is in the best interests of the Debtors' estates and creditors.

23.    I believe that absent the requested relief, the Debtors would be unable to effectively maintain their financial operations, which would cause immediate and irreparable harm to the Debtors, their estates, creditors, and all parties in interest.

24.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

## VI.    Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Pay Certain Prepetition Wages, Other Compensation and Reimbursable Employee Expenses and (II) Continue Employee Benefits Programs (the "<u>Wages Motion</u>")

25.    The Debtors are requesting the entry of any order (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation and reimbursable employee expenses and (ii) continue employee benefits programs, (b) authorizing and directing financial institutions to receive, process, honor and pay checks presented for payment and electronic payment requests relating to prepetition employee obligation.

26.    The Debtors' request under the Wages Motion includes payment of following Employee Obligations: (a) Wage Obligations; (b) Unpaid Payroll Service Fees; (c) Unremitted Deductions; (d) Unremitted Payroll Taxes; (e) Unpaid Health Benefits; (f) SPRS; (g) Per Diem Payments; (h) Flexible Benefits Plan Obligations; (i) Unpaid Employee Insurance Coverage Obligations; (j) Unremitted 401(k) Contributions; (k) Unpaid PTO;[4] (l) CBA Time Off; (m) Reimbursable Expenses; (n) Matching Contributions; (o) Target Benefit Contributions; (p) Tuition Reimbursement Plan Obligations; (q) Unpaid Director Expenses; (r) Unremitted Independent Contractor Compensation; and (s) Unremitted Union Dues (as each is defined in the Wages Motion).

27.    Additionally, the Debtors' request under the Wages Motion, includes continuation of the following Employee Obligations in the ordinary course of business on a postpetition basis: (a) Wage Obligations; (b) ADP payroll services; (c) Deductions and Payroll Taxes; (d) SPRS; (e) Per Diem Payments; (f) Employee Health Benefits; (g) Flexible Benefits Plan; (h) Paid Holidays; (i) Leave of Absence Time; (j) Target Benefit Plan; (k) 401k

---

[4] The Unpaid PTO is not a current cash obligation as Employees are only entitled to be paid for accrued and unused PTO upon termination.  The Debtors are authorized to remit PTO, if any, when such obligations become due and owing.

Plan; (l) Employee Insurance Coverage; and (m) Tuition Reimbursement Plan (as each is defined in the Wages Motion).

28.      The Debtors employ 1,040 Employees, approximately 624 of which are Union Employees are covered by CBAs.  In addition, approximately 953 of the 1,040 Employees are full-time Employees (crew at guarantee hours and non-crew Employees scheduled to work a minimum of forty (40) hours per week) and approximately 87 are part-time Employees (non-crew Employees scheduled to work less than forty (40) hours per week).

29.      In addition, the Debtors engage approximately 46 independent contractors who perform a variety of tasks that are essential to the Debtors' business.  The independent contractors include flight technicians, ground equipment mechanics, and ground operational representatives, typically located in foreign countries.

30.      As with any airline business, the lifeblood of the Debtors' operations are their pilots, flight attendants, ground crew, and other flight related employees, without which all operations would cease.  Just as critical, however, are the employees responsible for the ongoing business operations, including sales, customer service, information technology, administrative, accounting, legal, finance, management, supervisory, and other related tasks.  Their skills, knowledge and understanding with respect to the Debtors' operations, customer relations, and infrastructure are essential to the effective reorganization of the Debtors' businesses.

31.      I am of the understanding that the majority of the Debtors' Employees and Independent Contractors rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses.  Consequently, they will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits and reimbursable expenses.  Moreover, if the Debtors are unable to

satisfy such obligations, I believe that Employee morale and loyalty will be jeopardized at a time

when Employee support is critical.  In the absence of such payments, I believe that the Debtors'

Employees may seek alternative employment opportunities, perhaps with the Debtors'

competitors, thereby hindering the Debtors' ability to meet their customer obligations, and likely

diminishing customer confidence in the Debtors.  Moreover, it is my opinion that loss of

valuable Employees and the recruiting efforts that would be required to replace such Employees

would be distracting at a time when the Debtors should be focusing on maintaining their

operations.  Finally, I believe the Independent Contractors provide maintenance and operational

services that are vital to the success Debtors' businesses and it is essential to pay and honor the

Independent Contractor Compensation.

32.     I believe that the relief requested in the Wages Motion is in the best interests of the

Debtors' estates and will enable the Debtors to continue to operate their businesses in chapter 11

without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.

Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be

approved.

**VII.    Motion of the Debtors for Entry of Interim and Final Orders Authorizing the
         Debtors to Maintain and Administer Certain Customer and Industry Related
         Agreements and to Honor Prepetition Obligations Related Thereto (the "<u>Industry
         Agreements Motion</u>")**

33.     The Debtors are seeking authority to (i) continue to maintain and administer the

Industry Agreements and (ii) pay and otherwise honor their prepetition and postpetition

obligations relating thereto in the ordinary course of business and consistent with past practice.

34.     The Debtors' businesses are dependent on a network of agreements that govern all

of their operations.  In particular, the Industry Agreements relating to the Debtors' military

services are comprised of (a) an Air Mobility Command agreement (the "<u>AMC Agreement</u>")

with the United States Transportation Command ("USTRANSCOM"), which governs all of the Debtors' business operations with the United States Department of Defense ("DOD"), (b) an "Alliance Team" organizing agreement (the "Organizing Agreement"), which governs the management of the Alliance Team in soliciting the AMC Agreement, (c) an Alliance Team agreement (the "Alliance Team Agreement"), which governs each Alliance Team member's responsibilities and sets forth the percentage distribution among Alliance Team members with respect to proceeds under the AMC Agreement; and (d) a Multimodal Agreement (the "Multimodal Agreement") with USTRANSCOM, which governs the management of the transportation of goods and services using multiple means of transport under a single DOD contract. These Industry Agreements are critical to facilitating cooperation among the Alliance Team and to ensuring that the Debtors' business with USTRANSCOM, the source of the majority of the Debtors' revenue, operates smoothly. Additionally, the Debtors' business with commercial customers is entirely operated through customer contracts including various aircraft, crew, maintenance and insurance contracts (the "ACMI Contracts") and full service contracts (the "Full Service Contracts"). I therefore believe it is imperative that the Debtors give assurance to these customers that they will continue to honor their obligations with respect to these contracts.

35.    I believe that the Industry Agreements are an essential component to the Debtors' businesses. Should the Debtors fail to honor or pay valid unpaid prepetition obligations or continue to perform their obligations postpetition, I believe that these parties may refuse to perform their obligations under the Industry Agreements or otherwise put at risk the Debtors' important relationships with these parties, resulting in immediate and irreparable harm to the Debtors' businesses. Accordingly, the Debtors seek the authorization to honor and pay

outstanding amounts under the Industry Agreements, and continue to maintain and administer

the Industry Agreements so that industry and customer relationships are maintained and business

operations can continue uninterrupted notwithstanding the restructuring process.

36.     I believe that absent the interim relief requested in the Industry Agreements

Motion, including the request for authority to pay up to $150,000 in Industry Agreement

Obligations and to continue to pay subcontractors under the Multimodal Agreement in the

ordinary course of business, the Debtors' key industry relationships may be irreparably harmed,

a risk that cannot be taken at this critical stage in the restructuring process.   Additionally, I

believe that without these relationships, the Debtors estates will lose significant value to the

detriment of all creditors.   Accordingly, on behalf of the Debtors, I respectfully submit that the

Industry Agreements Motion should be approved.

**VIII.    Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b)(9)(i) Authorizing Debtors to Pay Certain Prepetition Claims of 503(b)(9) Claimants, Lien Claimants, and PACA Vendors, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Scheduling Final Hearing (the "503(b)(9) Motion")**

37.     The Debtors request entry of an order authorizing the Debtors to pay certain

prepetition claims of 503(b)(9) Claimants, Lien Claimants, and PACA Vendors.   The Debtors

operate in one of the most specialized and competitive industries in the world.   The uniqueness

of the airline industry, coupled with its highly regulated nature leave airlines with limited to no

options when shopping for vendors.   Even in those circumstances where more than one critical

vendor can be located to provide service, FAA regulations inhibit an airline's ability to switch

expeditiously from one supplier of goods or services to another.   The Debtors' options are often

even more limited than other airlines due to the significant amount of business they conduct with

the Military.   Through the Military charters, the Debtors are frequently required to fly to

extremely remote locations, where certain suppliers and service providers are simply the only

option available to the Debtors.  These essential suppliers of goods and services generally fall

into three categories: (i) 503(b)(9) Claimants; (ii) Lien Claimants; and (iii) PACA Vendors.

## A.    503(b)(9) Claimants

38.    As stated previously, the Debtors purchase goods from certain vendors who are

unaffiliated with the Debtors and are, by and large, sole source or limited source suppliers

without whom the Debtors could not operate.  A significant portion of these vendors have

supplied goods to the Debtors within twenty (20) days of the Petition Date, thus otherwise

entitling them to an administrative claim under section 503(b)(9) of the Bankruptcy Code.  While

typically these vendors would be required to file a motion or wait until a plan has been approved

to receive their administrative claim, the Debtors believe that certain of these vendors play such a

vital role in the Debtors' successful restructuring that it is in the best interest of the estate to pay

these claims at the commencement of the Chapter 11 Cases.

39.    The 503(b)(9) Claimants do not include all of the Debtors' vendors who would

otherwise be entitled to an administrative claim, rather, the 503(b)(9) Claimants are limited to

suppliers that (a) provide unique and specialized goods that are otherwise not readily available,

(b) provide goods that the Debtors are unable to procure without incurring significant migration

costs, operational delays, or compromising quality, (c) do not have long-term written supply

contracts such that the vendor could be compelled to continue providing goods or services in a

timely and cost-efficient manner without unduly disrupting the Debtors' operations postpetition,[5]

or (d) provide goods that are impossible to replace.

---

[5] Importantly, in several cases, the Debtors' contracts with certain of these vendors provide only a framework for the issuance of purchase orders that are limited in scope to particular projects or orders.  Thus, the Debtors' postpetition ability to use the contracts to compel their vendors and suppliers to continue to provide goods and services may be limited.

40.     Many of these 503(b)(9) Claimants are in the unique position of holding a virtual monopoly over the goods they provide due to their location, FAA regulations, or both. Replacement vendors, if available, would likely result in higher costs and significant delays for the Debtors.  Even in the limited circumstances where there may be an alternative vendor, if the Debtors can benefit from maintaining lower costs of goods and services purchased during the postpetition period and avoid the severe disruption that might be occasioned by the cessation of service therefrom, I believe it is prudent for the Debtors to pay selected 503(b)(9) Claimants some or all of their prepetition claims.  However, except under extraordinary circumstances, such payment would be contingent on an agreement that the 503(b)(9) Claimants continue to sell their goods or services to the Debtors on a going forward basis on terms favorable to the Debtors.

41.     I believe that the Debtors are mindful of the requirements of the Bankruptcy Code and their fiduciary obligations to preserve and maximize the value of their estates. Indeed, despite the critical need for the receipt of essential goods and services, the Debtors historically have sought to bargain with their vendors to achieve the lowest price, the best quality, and the most favorable payment terms possible for each necessary product.  The Debtors recognize that efficiency in procurement is critical to achieving profitability, and have developed valued relationships with many suppliers who have met the Debtors' standards for price, quality and payment terms.  The Debtors hope to maintain and improve upon those vendor relationships on a postpetition basis.

42.     The Debtors seek authority to pay, in their sole discretion based on their business judgment, up to $1,197,826 to the 503(b)(9) Claimants on account of their prepetition claims pursuant to certain payment procedures that would condition payment on receipt by the Debtors of favorable trade terms.  Because the Debtors typically pay for the

16

products, supplies and services provided by the 503(b)(9) Claimants within fifteen (15) to thirty (30) days of receipt, the vast majority of prepetition amounts owed with respect of such products and supplies will become due and payable, in the ordinary course of business and consistent with past practice, in the twenty-one (21) days after the Petition Date.

**B.      Identification of 503(b)(9) Claimants**

43.      The Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records and consulting operations management and purchasing personnel to identify certain critical business relationships and/or suppliers of goods the loss of which could immediately and irreparably harm their businesses, shrink their market share, reduce their enterprise value and/or significantly impair their going-concern viability.

44.      The Debtors reviewed Purchase Order/Repair Order receipts and reviewed catered flights to determine which vendors had provided goods to the Debtors within twenty (20) days of the Petition Date.

45.      The Debtors believe this deliberative process, combined with their comprehensive payment protocol, justifies the relief requested herein.   To be clear, vendors with long term contracts are not part of the Debtors' proposed program.   Instead, the Debtors will enforce their rights in court if such vendors use these chapter 11 filings or the Debtors' financial condition as an excuse to suspend shipments, modify payment terms, or otherwise impair the Debtors' rights.

46.      The 503(b)(9) Claimants generally, but not exclusively, fall into the following categories: (i) aircraft parts suppliers and maintenance service providers; (ii) essential amenity providers; (iii) crew and employee related providers; (iv) information technology suppliers and service providers, and (v) flight navigation systems providers.

C.       **Lien Claimants**

47.      In the ordinary course of business, the Debtors engage a number of maintenance service providers to repair, maintain, and improve the Debtors' aircraft.  Like aircraft parts suppliers, it is my understanding that aircraft maintenance service providers are also subject to licensing, certification, or approval of the FAA.  All work on commercial passenger jets must be validated and signed off by FAA-licensed A&P maintenance service providers.  This work must be approved by the OEM or the Debtors' engineers, or both, in accordance with the Debtors' FAA approved maintenance plan.  A&P maintenance service providers must stay current with OEM updates and work orders pre-approved by the Debtors' engineers.

48.      While the Debtors employ a certain amount of A&P maintenance service providers, it is not feasible to keep employees at every airport in over 100 countries the Debtors service.  Often, the Debtors utilize one or more third party pre-approved licensed A&P Outside Maintenance Providers.  As the demand for the Outside Maintenance Providers varies greatly from day-to-day, the Debtors have structured their relationships to minimize the likelihood that all Outside Maintenance Providers are busy with assignments for other airlines, as the inability to locate an Outside Maintenance Provider would result in flight cancellation until the Debtors could fly their own maintenance service provider to the remote location.  It is my understanding that the Debtors have developed their relationships with these Outside Maintenance Providers in remote locations over a number of years.  They have come to rely on the high quality and priority services they receive, all on competitive terms.

49.      It is my understanding that to use a new Outside Maintenance Provider, the Debtors must conduct extensive audits.  Their ability to quickly audit new Outside Maintenance Providers, even if they are available, is limited.  In addition, it is my understanding that in compliance with FAA guidelines, new Outside Maintenance Providers are required to be trained

18

on the Debtors' FAA approved specific manuals. Consequently, it is essential to the Debtors'
operations to maintain their relationships with these essential Outside Maintenance Providers.

50.     Another integral part of the Debtors' operations is the use of commercial common
carriers, movers, shippers, freight forwarders/consolidators, delivery services, warehousing
companies, customs brokers, shipping auditing services and certain other third-party services
providers to ship, transport, store, move through customs and deliver goods and packages
through established distribution networks.  The Debtors rely extensively on Shippers to transport
parts, goods and packages to and from third parties including, without limitation, their Outside
Maintenance Providers.

51.     It is my understanding that in the ordinary course of the Debtors' business, many
of the Outside Maintenance Providers and Shippers are in possession of aircraft, engines, and
other equipment that are vital to the Debtors' operations and may assert possessory liens and
refuse to redeliver these items to the Debtors until they are paid prepetition amounts.  I have been
informed that in some circumstances, these liens can be perfected notwithstanding the automatic
stay established by section 362(a) of the Bankruptcy Code.  Indeed, I have been informed that
pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the
extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the
automatic stay.[6]

52.     I believe that both the Outside Maintenance Providers and the Shippers are
essential to the Debtors' ability to make on-the-spot repairs.  Without the ability to make on-the-
spot repairs in remote locations, aircraft would be stranded.  In each instance, the adverse impact
on the Debtors' business operations and revenues is self-evident.  At this stage of the Debtors'

---

[6]  Nothing contained herein is deemed an acknowledgement or admission by the Debtors regarding the existence
or validity of any liens, and the Debtors rights with respect thereto are hereby reserved.

restructuring efforts, switching Outside Maintenance Providers or Shippers will risk the uninterrupted operation of the Debtors' business.  In addition the options for switching Outside Maintenance Providers and Shippers is extremely limited and, in many instances, nonexistent.  It is my belief that the relief requested herein is essential to the maintenance of the Debtors' safe, uninterrupted, and efficient operations, as well as their restructuring efforts.

53.    The estimated value of the goods or property of the Debtors in the possession of the Lien Claimants is approximately $3,850,900.  As of the Petition Date, the Debtors estimate that the valid, accrued, unpaid, prepetition claims of the Lien Claimants is approximately $199,727.  The Debtors are seeking authority to pay the outstanding prepetition Lien Claims in an amount not to exceed $199,727.

### D.    PACA Vendors

54.    In addition, to ensure that the Debtors' in-flight services continue to receive a constant supply of fresh fruits and vegetables postpetition, the Debtors seek authority to continue to pay in the ordinary course of business and consistent with their historical practices, claims arising, or of the type, under the PACA to the PACA Vendors.

55.    The Debtors believe that a certain portion of the goods purchased from vendors may qualify as "perishable agricultural commodit[ies]" under PACA.  As a result, insofar as those vendors abide by the notice requirements of PACA, I have been informed that such vendors will be eligible to assert PACA Claims granting them priority ahead of all other secured and unsecured creditors in the Debtors' chapter 11 cases.  Accordingly, it is my understanding that payment of PACA Claims at this time will not prejudice or affect the amount available for distributions to other creditors of the Debtors.  To ensure that the supply of fresh produce continues unimpeded, I believe that it is imperative that the Debtors be authorized to pay all

prepetition and postpetition PACA Claims in the ordinary of business and consistent with their

historical practices.

56.     I believe that the $1,426,553 of relief requested in the 503(b)(9) Motion is in the

best interests of the Debtors' estates and will enable the Debtors to continue to operate their

business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the

Debtors' estates.   Accordingly, on behalf of the Debtors, I respectfully submit that the 503(b)(9)

Motion should be approved.

**IX.    Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C.
§§ 105(a), 363(b), 363(c), 1107(a), and 1108 and Fed. R. Bank. P. 6003(b) and 6004(h)
(I) Authorizing Debtors To Pay Prepetition Obligations Owed to Foreign Creditors,
(II) Authorizing And Directing Financial Institutions to Honor and Process Related
Checks and Transfers, (III) Scheduling Final Hearing (the "<u>Foreign Creditors
Motion</u>")**

57.     The Debtors request entry of interim and final orders authorizing, but not

directing, the Debtors to pay, in their sole discretion and in the ordinary course of business, the

prepetition claims owing to Foreign Creditors.

**A.     The Debtors' Foreign Creditors**

58.     As the largest provider of air transportation services for the Military and other

international cargo carriers, a significant portion of the Debtors' flights are international.   The

Debtors serve over 100 airports throughout the world.   A significant majority of the Debtors'

annual flight operations involve origins or destinations outside the United States as a result of

their business with the Military, which almost always requires an international component.

59.     In the ordinary course of conducting their business, the Debtors incur various

obligations to numerous Foreign Vendors, as well as to various Foreign Authorities. The Debtors

rely on these Foreign Creditors to supply various goods, services, permits, licenses, and rights to

the Debtors, as discussed in more detail immediately below.

### B.    Access to Foreign Airspace and Airports

60.    The most important aspect of the Debtors' international operations is their ability to access the airspace over foreign countries.  The Debtors are required to remain current on their payment obligations to Foreign Authorities and other Foreign Creditors to, among other things, access airspace and operate within their air traffic control systems.  Significant portions of these payment obligations are attributable to Foreign Overflight Fees charged by Foreign Authorities to enable the Debtors to fly over, but neither take off nor land in, the Foreign Authorities' countries.  If the Debtors are not current on the Foreign Overflight Fees, overflight privileges may be suspended and routes would either be diverted, or more likely cancelled.  In addition, I believe that the Debtors' continued access to foreign airports, passenger terminals, and ticketing and reservation offices is vital to the continued international operation of the Debtors' business.

61.    Furthermore, the Debtors' international operations are conducted under "route authority" granted by the DOT, which, in addition to other foreign civil aviation authorities, has the power to suspend and reallocate air transportation routes in the event of extended nonuse.  I believe that the likely disruption of business that would occur were the Debtors unable to satisfy prepetition obligations to Foreign Creditors would affect the Debtors' international flight schedules, potentially resulting in the DOT's revocation or suspension of the Debtors' travel routes, which, in turn, would severely undermine the Debtors' efforts to continue operating and successfully reorganize.

### C.    Ground Handling and Maintenance Services

62.    The Debtors rely on Foreign Vendors to service and maintain their aircraft at international airports.  While the Debtors maintain a certain amount of spare parts in their "fly away kits" stored within the aircraft, it is logistically impossible to maintain a full inventory of every part that may be needed to allow aircraft to continue in operations safely and continuously.

As such, circumstances often arise where the "fly away kit" will not have the necessary part and the Debtors must obtain the part at an international airport. The Debtors have developed a network of suppliers in and around these airports that have the necessary parts in stock or are able to obtain the parts in an expedited fashion. I believe that requiring the Debtors to locate substitute suppliers in an around these locations would require a herculean effort and the incurrence of substantial monetary costs.

63.    The Debtors also rely on Foreign Creditors to provide cargo handling services, passenger screening, catering and aircraft inspection, and other security related services. The Debtors are subject to regulations imposed by the FAA for aircraft safety and sanitation. As such, the Debtors must utilize Foreign Vendors to inspect their aircraft regularly and to verify compliance with FAA obligations.

**D.    Takeoff, Landing, and Fuel**

64.    Foreign Vendors assist the Debtors with landing and refueling the Debtors' aircraft while in foreign jurisdictions, and provide a range of related aircraft services known as "ground handling services." The Debtors employ foreign ground crew specialists to communicate with their pilots and airport traffic controls to guide the pilots on take-offs and landings at foreign airports. In addition, the Debtors rely on Foreign Vendors to provide jet fuel and personnel to assist the Debtors in refueling their aircraft while abroad.

**E.    Flight Communications and Data**

65.    To sustain their complex international flight operations, the Debtors require timely communication with their aircraft and access to critical data, including air traffic, weather patterns, and other information affecting the ability to safely and effectively navigate and communicate with their aircraft. The Debtors use several Foreign Vendors to provide these services that could not be easily replaced without significant costs and delay.

23

### F.      In-flight Goods and Services

66.      The Debtors regularly make payments to Foreign Vendors that supply food, drink, and other goods to the Debtors for use in connection with their day to day international operations and in-flight services provided to passengers.  The Debtors also utilize certain goods domestically that are supplied by Foreign Vendors.

### G.      Foreign Taxes

67.      The Debtors collect, withhold, and incur, on behalf of Foreign Governmental Authorities, an assortment of foreign taxes, fees, and other charges, including, without limitation, corporate gross and net income taxes, net worth taxes, property taxes, liquor taxes, license taxes, payroll withholding taxes, value added taxes, departure taxes, customs duties and excise taxes, ticket taxes, general sales taxes, fuel taxes, arrival and departure taxes, airport fees, and passenger charges.

68.      The Debtors are obligated to timely collect, withhold, incur, and remit Foreign Taxes to the applicable Foreign Authorities.  It is my understanding that nonpayment of Foreign Taxes may cause Foreign Authorities to take precipitous action that could disrupt the Debtors' operations and potentially impose significant additional and unnecessary costs to the Debtors' estates.

### H.      Continued Foreign Operations

69.      As stated, I believe the Debtors' foreign operations are an essential element of their operations.  The global nature of the Debtors' business is a key source of revenue and a major factor in the overall reputation of the Debtors and the loyalty of their customers, especially the Military.  To preserve the value of the Debtors' assets and operations, the Debtors must have the ability to continue to fund and maintain their international operations on an uninterrupted basis.  Because the Debtors' customers, specifically the Military, select the destinations to which

24

the Debtors fly, the Debtors have little control over which airports they are required to service. As such, it would be impossible for the Debtors to divert routes or attempt to substantially change their foreign operations.

70.     Most of the Foreign Creditors, specifically the Authorities responsible for Foreign Overflight Fees and all the maintenance, ground, fuel, baggage, and other service providers at foreign airport locations, have little or no connection to the United States.  I have been informed that although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is global, it is difficult (if not impossible) to enforce the stay in foreign jurisdictions if the creditor to which enforcement is sought has no presence in the United States.  As a result, it is my understanding that despite the commencement of these Chapter 11 Cases and the imposition of the automatic stay, the Foreign Creditors likely would be able to immediately pursue remedies and seek to collect prepetition amounts owed to them.  As such, I believe that there is the real risk that Foreign Creditors may attach or seize the Debtors' assets in their jurisdictions even before obtaining a judgment— which would significantly disrupt operations.

71.     Additionally, in the absence of payment of their Foreign Claims, I believe there is a distinct risk that certain Foreign Creditors may refuse to provide necessary goods and services, or allow access to foreign airspace and airports, thereby jeopardizing the Debtors' ability to sustain international operations.

72.     I believe that the interim relief requested in the Foreign Creditors Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without any disruption so as to avoid immediate and irreparable harm to the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Foreign Creditors Motion should be approved.

X.      **Motion of the Debtors Pursuant to Sections 105(a), 362, 363(b) and 553 of the Bankruptcy Code for Interim and Final Orders (I) Authorizing Debtors to (A) Apply Prepetition Payments to Prepetition and Postpetition Obligations Under Fuel Supply Contracts, (B) Authorizing Debtors to Pay Prepetition Amounts Owed to Fuel Supply Parties, (C) Authorizing Debtors to Honor, Perform, and Exercise Their Rights and Obligations Under Fuel Supply Arrangements and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "<u>Fuel Supply Motion</u>")**

73.      The Debtors request entry of interim and final orders seeking the following relief: (a) modification of the automatic stay under section 362 of the Bankruptcy Code to permit the Fuel Suppliers to apply prepayments or credits to the Debtors' fuel and storage facility usage both prepetition and postpetition; (b) authorization to pay any prepetition outstanding obligations of the Fuel Suppliers; and (c) authorization, to the extent necessary, to continue honoring, performing and exercising their rights and obligations (whether prepetition or post-petition) to AMC and the Fuel Suppliers.

74.      An uninterrupted fuel supply for the Debtors' fleet of aircraft is crucial to their continued operations and successful reorganization. I believe that many of the Debtors' Fuel Suppliers cannot be easily or quickly replaced. In one particular instance, the Debtors purchase fuel from one branch of the federal government while procuring approximately 80% of their overall revenues from another branch. Any problems with this supply arrangement will likely have a significant impact on the Debtors' prospects for the future. In addition, it is my understanding there is also a risk that the Debtors' revenue stream could be set off against prepetition obligations owed to its Fuel Suppliers, thus drying up the Debtors' cash liquidity.

75.      Absent the relief requested herein, the Debtors' fuel supply and distribution system and potentially their entire business likely would be disrupted, thereby stranding the Debtors' aircraft, passengers and employees.  This would severely disrupt the Debtors' flight schedules and seriously damage the Debtors' credibility in the marketplace.  Even if the Debtors

26

were able to procure alternate sources of fuel, which, in the case of flights into U.S. Military bases is not even possible, I believe the Debtors' costs for fuel would dramatically increase because of the piecemeal nature of an alternate supply, and, moreover, there would be no assurance that the Debtors would be able to even timely procure adequate fuel. Accordingly, on behalf of the Debtors, I respectfully submit that the Fuel Supply Motion should be approved.

## OTHER FIRST DAY MOTIONS

**XI.    Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541 (I) Authorizing the Debtors to Pay Taxes and Fees and (II) Directing Financial Institutions to Honor and Process Related Checks and Transfers (the "Taxes Motion")**

76.    Pursuant to the Taxes Motion, the Debtors are requesting authority to pay certain prepetition sales, use, transportation, excise, immigration, fuel and employment Taxes as well as prepetition Fees for licenses, permits, and other similar charges and assessments owed to various taxing, licensing, and other governmental Authorities, as they arise after the Petition Date.

77.    In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities. The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these Chapter 11 Cases. Specifically, I am informed by the Debtors' advisors that the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens or seek to lift the automatic stay. In addition, it is my understanding that certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract those key employees from their duties related to the Debtors' restructuring.

78.     Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

## XII.     Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Continue Prepetition Insurance Coverage and Related Practices and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers (the "Insurance Motion")

79.     The Debtors request authority to (a) continue their prepetition Workers' Compensation Programs and prepetition Insurance Policies and honor obligations thereunder with their Insurance Carriers, and (b) revise, extend, supplement, or change their insurance coverage by, among other things, entering into new insurance policies, renewing the current Insurance Policies or purchasing new postpetition policies.

80.     The laws of the various states in which the Debtors operate require the Debtors to maintain workers' compensation policies and programs to provide certain of their employees with workers' compensation benefits for claims arising from or related to their employment with the Debtors.  The Debtors are further required to maintain workers' compensation policies pursuant to the DBA, which is an extension of the federal workers' compensation program.  The DBA requires American employers providing welfare or similar services outside the United States, for the benefit of the Armed Services, to extend certain workers' compensation benefits to their employees performing under applicable contracts.   The Debtors maintain workers' compensation and DBA coverage through a combination of fully-insured, third-party insurance programs or deductible programs.

81.     In the ordinary course of business, the Debtors maintain approximately 35 Insurance Policies with approximately 20 Insurance Carriers.[7]  The Insurance Policies provide coverage for, among other things: cargo; commercial automobile; crime; DBA; directors' and officers' liability; employment practices liability; employed lawyers professional liability; fiduciary liability; special crime; foreign liability; hull, spares & liability; and property.  The Insurance Policies are essential to the preservation of the value of the Debtors' businesses, properties, and assets.  In many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities.

82.     In connection with the Insurance Policies, JLT Aerospace, a third-party insurance broker (the "Insurance Broker"), assists the Debtors in obtaining comprehensive insurance coverage in the most cost-effective manner.  In particular, the Insurance Broker procures and negotiates the Insurance Policies with the Insurance Carriers, obtaining the Debtors' insurance coverage on advantageous terms and at competitive rates.

83.     I believe that failure to pay premiums and related insurance expenses when due may harm the Debtors' estates in several ways.  I understand that if the Debtors are unable to maintain adequate insurance, the Debtors would be prohibited from engaging in air transportation within the United States, and their estates would suffer immediate and irreparable harm because failure to maintain appropriate insurance would expose the Debtors' estates to significant liabilities.  In addition, it is my understanding that the Debtors' aircraft leases require the Debtors to maintain insurance coverage on, among other things, their leased aircraft.

84.     I believe that staying workers' compensation claims could have a detrimental effect on the financial wellbeing and morale of the Debtors' employees and lead to their

---

[7] A list of the Debtors' Insurance Policies is attached as Exhibit B to the Insurance Motion.

departure.  Such circumstances could cause a severe disruption in the Debtors' business to the detriment of all parties in interest.

85.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

## XIII.   Motion of the Debtors for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")

86.    The Debtors are seeking entry of an order (a) determining that the Debtors' Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving the Debtors' proposed adequate assurance, (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance, and (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion.

87.    In the ordinary course of business, the Debtors incur utility expenses for gas, water, electricity, waste management and similar utility services provided by the Utility Providers.[8]  Approximately ten (10) Utility Providers render these services to the Debtors.  On average, the Debtors spend approximately $17,000 per month for utility services.

88.    I believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  I further believe that any interruption in utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues and profits, thereby seriously jeopardizing

---

[8] A list of the Utility Providers is attached as Exhibit 1 annexed to Exhibit A to the Utilities Motion.

the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. Thus, it is critical that utility services continue uninterrupted during these Chapter 11 Cases.

89.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

## XIV.    Motion of the Debtors for Entry of an Order Authorizing Rejection of Certain Aircraft and Engine Leases (the "<u>Aircraft Rejection Motion</u>")

90.     The Debtors are seeking entry of an Order (a) authorizing the rejection of certain leases of aircraft (including engines) (the "<u>Aircraft Lease(s)</u>") and spare engines (the "<u>Engine Lease(s)</u>," and together with the Aircraft Lease(s), the "<u>Aircraft and Engine Lease(s)</u>"), effective on the indicated date (the "<u>Effective Date</u>")[9] and (b) to the extent it is necessary, deeming the rejection consistent with section 1110(c)(1) of the Bankruptcy Code.

91.     The Debtors do not own any of the aircrafts or engines used to conduct their business, but rather lease such equipment for the operation of their cargo, passenger and military operations. As of the Petition Date, the Debtors are parties to fourteen (14) aircraft leases.

92.     Before the Petition Date, the Debtors, with the assistance of their advisors, began the process of reviewing and analyzing all of their contractual obligations so as to identify those aircraft leases that are burdensome to their estates and should be rejected pursuant to section 365 of the Bankruptcy Code, resulting in significant cost savings to the Debtors' estates. To date, the Debtors have identified six (6) aircraft (the "<u>Excess Aircraft</u>") and (2) spare engines (the "<u>Excess Engine(s)</u>," together with the Excess Aircraft, the "<u>Excess Aircraft and Engines</u>"), as set

---

[9] As reflected on **Exhibit 1** to **Exhibit A** to the Aircraft Rejection Motion (the "<u>Excess Aircraft and Engines List</u>"), the Debtors seek to reject certain Excess Aircraft *nunc pro tunc* to the Petition Date.

forth on the Excess Aircraft and Engines List, that are no longer necessary to operate the Debtors' businesses in accordance with their business plan.

93.     A portion of the Debtors' businesses over the past two (2) years supported a cargo business supporting various government contracts.  Due to the cessation of the AMC business for expansion flying, the Excess Aircraft and Engines are not needed for the Debtors' operations and if the Aircraft and Engine Leases are not rejected, they will burden the estates with unnecessary costs.  Load factors and yields have decreased as the growth in air cargo capacity has exceeded market demand.  The Debtors have estimated that the rejection of the Aircraft and Engine Leases listed on Excess Aircraft and Engines List will result in annual savings of over $15 million.

94.     After reviewing the terms of the Aircraft and Engine Leases, the Debtors have determined they are of no utility and value to them.  The Debtors, in the Prior Bankruptcy rejected several aircraft leases, but with the end of the AMC expansion flying, the Debtors do not anticipate needing the Excess Aircraft and Engines.  Furthermore, pursuant to the Debtors' business plan, the Debtors must rationalize their fleet.  In doing so, the Debtors have determined that the Aircraft and Engine Leases are no longer profitable and will not be necessary for the Debtors' business operations going forward.

95.     I believe that the Aircraft Leases that the Debtors propose to reject are extremely burdensome leases and that continuing such leases will irreparably harm the Debtors' estates. Accordingly, on behalf of the Debtors, I respectfully submit that the rejection of the affected Aircraft Leases is clearly in the best interests of their estates and their creditors and therefore the Aircraft Rejection Motion should be approved.

**XV.    Motion of the Debtors for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (the "OCP Motion")**

96.      The Debtors are requesting authority to retain and compensate certain professionals utilized in the ordinary course of business (each, an "OCP" and, collectively, the "OCPs"), [10] pursuant to the compensation procedures outlined in the OCP Motion (the "Compensation Procedures"), without the need for such OCP to file a formal application for retention and compensation pursuant to sections 327, 328 or 330 of the Bankruptcy Code.

97.      The Debtors employ six (6) law firms, each utilized in the ordinary course of business, who render a wide range of legal services to the Debtors in a variety of matters unrelated to the Chapter 11 Cases, including litigation, regulatory matters, labor and employment matters, and have a direct and significant impact on the Debtors' day-to-day operations.  The Debtors also employ one (1) accounting firm, utilized in the ordinary course of business, which renders a range of accounting services to the Debtors.

98.      I believe that the OCPs have a great deal of knowledge, expertise and familiarity with the Debtors and their operations.  I further believe that, unless these parties are compensated in the ordinary course of business, some may not continue to provide their services to the Debtors.  I therefore believe that the continued employment and compensation of the OCPs is in the best interests of their estates, creditors and other parties in interest.

99.      Additionally, although some of the OCPs may hold unsecured claims against the Debtors in connection with services rendered to the Debtors prepetition, I do not believe that any of the OCPs has an interest materially adverse to the Debtors, their creditors or other parties in

---

[10] A list of the Debtors' current OCPs is set forth on Exhibit 1 annexed to Exhibit A to the Motion.

interest.  Importantly, the Debtors are not requesting authority to pay prepetition amounts owed

to OCPs.  Accordingly, I respectfully submit that the OCP Motion should be approved.

**Exhibit B**

**Budget**

**Global Aviation Holdings Inc.**
Weekly Cash Flow Forecast

| Week Ending | Notes | 11/15/2013 | 11/22/2013 | 11/29/2013 | 12/6/2013 | 12/13/2013 | 12/20/2013 | 12/27/2013 | 1/3/2014 | 1/10/2014 | 1/17/2014 | 1/24/2014 | 1/31/2014 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts:** | | | | | | | | | | | | | | |
| Military | | 3,366,818 | 4,842,473 | 6,031,756 | 4,975,244 | 5,735,217 | 5,915,799 | 5,915,799 | 6,131,787 | 5,915,799 | 4,929,458 | 4,929,458 | 5,145,445 | 63,835,053 |
| Commercial | | 2,704,993 | 1,551,853 | 1,944,936 | 1,382,527 | 1,857,253 | 1,276,253 | 1,276,253 | 1,947,221 | 1,341,770 | 1,715,270 | 1,395,867 | 1,715,270 | 20,109,468 |
| Other | | 292,993 | (1,420,012) | 50,000 | 50,000 | 54,381 | 50,000 | 50,000 | 50,000 | 50,000 | 1,856,141 | 800,000 | 311,000 | 2,194,503 |
| **Total Receipts** | | **6,364,804** | **4,974,314** | **8,026,691** | **6,407,771** | **7,646,852** | **7,242,053** | **7,242,053** | **8,129,008** | **7,307,569** | **8,500,869** | **7,125,325** | **7,171,716** | **86,139,024** |
| | | | | | | | | | | | | | | |
| **Disbursements:** | | | | | | | | | | | | | | |
| Aircraft and Engine Leases | | 0 | 0 | 6,250 | 0 | 100,000 | 0 | 0 | 226,250 | 0 | 4,648,477 | 245,000 | 47,250 | 5,273,227 |
| Maintenance | | 180,408 | 149,717 | 120,000 | 1,178,053 | 171,772 | 717,123 | 756,723 | 256,723 | 131,368 | 7,261,263 | 1,420,000 | 1,055,000 | 13,398,150 |
| Compensation and Benefits | | 1,552,313 | 2,119,846 | 1,733,998 | 1,438,408 | 2,037,930 | 1,698,584 | 1,883,827 | 1,278,709 | 2,417,287 | 1,555,917 | 2,107,804 | 618,512 | 20,443,136 |
| Fuel | | 5,883,781 | 1,701,470 | 5,771,354 | 1,560,409 | 1,560,409 | 1,560,409 | 5,581,747 | 1,525,575 | 1,525,575 | 1,525,575 | 1,525,575 | 5,801,764 | 35,523,644 |
| General | | 1,555,794 | 1,626,258 | 1,596,140 | 1,947,486 | 2,651,304 | 1,025,209 | 1,153,208 | 1,521,476 | 2,651,502 | 1,641,532 | 1,230,055 | 1,572,293 | 20,172,257 |
| Restructuring Professional Fees | | 0 | 0 | 0 | 0 | 300,000 | 0 | 0 | 15,000 | 280,000 | 816,000 | 0 | 15,000 | 1,431,000 |
| **Total Disbursements** | | **9,172,296** | **5,597,291** | **9,227,741** | **6,124,356** | **6,821,416** | **5,001,326** | **9,375,505** | **4,823,733** | **7,010,731** | **17,448,764** | **6,528,434** | **9,109,819** | **96,241,413** |
| | | | | | | | | | | | | | | |
| **Net Cash Flow** | | **(2,807,493)** | **(622,977)** | **(1,201,050)** | **283,415** | **825,435** | **2,240,727** | **(2,133,452)** | **3,305,275** | **296,838** | **(8,947,895)** | **596,891** | **(1,938,103)** | **(10,102,389)** |
| | | | | | | | | | | | | | | |
| **Debt Facility Balances** | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **Pre-Petition First Lien Facility** | | | | | | | | | | | | | | |
| Beginning Balance | | 39,000,000 | 32,635,196 | 27,660,883 | 19,634,191 | 13,226,420 | 5,579,569 | - | - | - | - | - | - | 39,000,000 |
| Less: Post-Petition Receipts | | (6,364,804) | (4,974,314) | (8,026,691) | (6,407,771) | (7,646,852) | (5,579,569) | - | - | - | - | - | - | (39,000,000) |
| **Ending Balance** | | **32,635,196** | **27,660,883** | **19,634,191** | **13,226,420** | **5,579,569** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | | | | |
| **DIP Facility** | | | | | | | | | | | | | | |
| Beginning Balance | | - | 6,767,609 | 12,364,900 | 21,592,642 | 27,722,052 | 34,543,468 | 37,882,309 | 40,015,762 | 36,717,516 | 36,420,678 | 45,368,573 | 44,771,681 | - |
| DIP Facility Fees | (1) | 510,000 | - | - | 5,054 | - | - | - | 7,029 | - | - | - | - | 522,083 |
| Excess Cash Sweep | (2) | (2,914,687) | - | - | - | - | - | - | - | - | - | - | - | (2,914,687) |
| Less: Receipts | (3) | - | - | - | - | - | (1,662,484) | (7,242,053) | (8,129,008) | (7,307,569) | (8,500,869) | (7,125,325) | (7,171,716) | (47,139,024) |
| Plus: Disbursements | | 9,172,296 | 5,597,291 | 9,227,741 | 6,124,356 | 6,821,416 | 5,001,326 | 9,375,505 | 4,823,733 | 7,010,731 | 17,448,764 | 6,528,434 | 9,109,819 | 96,241,413 |
| **Ending Balance** | | **6,767,609** | **12,364,900** | **21,592,642** | **27,722,052** | **34,543,468** | **37,882,309** | **40,015,762** | **36,717,516** | **36,420,678** | **45,368,573** | **44,771,681** | **46,709,785** | **46,709,785** |
| | | | | | | | | | | | | | | |
| **Total Pre-Petition and DIP Borrowings** | | **39,402,806** | **40,025,783** | **41,226,833** | **40,948,472** | **40,123,037** | **37,882,309** | **40,015,762** | **36,717,516** | **36,420,678** | **45,368,573** | **44,771,681** | **46,709,785** | **46,709,785** |
| | | | | | | | | | | | | | | |
| DIP Availability | (4) | 11,597,194 | 10,974,217 | 9,773,167 | 10,051,528 | 10,876,963 | 13,117,691 | 10,984,238 | 14,282,484 | 14,579,322 | 5,631,427 | 6,228,319 | 4,290,215 | 4,290,215 |
| | | | | | | | | | | | | | | |
| **Cash** | | | | | | | | | | | | | | |
| Beginning Balance | | 3,914,687 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 3,914,687 |
| Less: Excess Cash Sweep | (2) | (2,914,687) | - | - | - | - | - | - | - | - | - | - | - | (2,914,687) |
| **Ending Balance** | | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** | **1,000,000** |
| | | | | | | | | | | | | | | |
| **Cash Plus DIP Availability** | | **12,597,194** | **11,974,217** | **10,773,167** | **11,051,528** | **11,876,963** | **14,117,691** | **11,984,238** | **15,282,484** | **15,579,322** | **6,631,427** | **7,228,319** | **5,290,215** | **5,290,215** |

**Notes**

*(1) Includes 1.00% of total DIP Facility commitment (fully earned and payable on the Interim Facility Effective Date) and Unused Line Fee (0.75% per annum of unused borrowings) payable in arrears on a monthly basis*

*(2) Cash above $1 million swept to Cerberus controlled accounts to repay borrowings*

*(3) Post-petition receipts are first applied to repay Pre-Petition First Lien Facility and then to the DIP Facility*

*(4) Calculated as total DIP Facility ($51 million) less Pre-Petition First Lien Facility and net DIP Revolver borrowings outstanding; subject to budget and financial covenant limitations*

**Global Aviation Holdings Inc.**
**Professional Fees Budget**

| Role | Provider | Professional Fees Budget | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Post-Petition | | | | | Completion / Tail Fees | 5-Month Total |
| | | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | | |
| Debtor | | | | | | | | |
| Bankruptcy Counsel | Haynes Boone | $ 500,000 | $ 300,000 | $ 300,000 | $ 250,000 | $ 450,000 | $ 200,000 | $ 2,000,000 |
| Regulatory Counsel | Zuckert, Scoutt | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 50,000 | 175,000 |
| Local Bankruptcy Counsel | Polsinelli | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 210,000 |
| Labor Counsel | Ford & Harrison | 100,000 | 50,000 | 25,000 | - | - | - | 175,000 |
| Fin'l Advisor | Imperial Capital | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 1,187,500 | 1,812,500 |
| Claims Agent | KCC | 75,000 | 50,000 | 25,000 | 25,000 | 75,000 | 50,000 | 300,000 |
| Tax / Accounting | Ernst & Young | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | - | 250,000 |
| Aircraft Lease Advisor | Worldwide Aero | 100,000 | 100,000 | 50,000 | - | - | - | 250,000 |
| Expenses | | 50,000 | 25,000 | 12,500 | 12,500 | 25,000 | 50,000 | 175,000 |
| UCC | | | | | | | | |
| Legal | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | | 250,000 |
| Fin'l Advisor | | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | | 175,000 |
| US Trustee | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 90,000 |
| **Total Professional Fees / Expenses** | | **$ 1,160,000** | **$ 860,000** | **$ 747,500** | **$ 622,500** | **$ 885,000** | **$ 1,587,500** | **$ 5,862,500** |

POLSINELLI PC
Jason A. Nagi, Esq.
900 Third Avenue, 21st Floor
New York, New York 10022
Tele: 212.659.7300
Fax:  212.918.8989
Email:  jnagi@polsinelli.com

POLSINELLI PC
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile.: (302) 252-0921
Email: cward@polsinelli.com
        jedelson@polsinelli.com

HAYNES AND BOONE, LLP
Henry Flores
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
Email: henry.flores@haynesboone.com

*PROPOSED COUNSEL TO THE DELAWARE
DEBTORS AND DEBTORS IN POSSESSION*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | § | **Chapter 11** |
| | § | |
| **GLOBAL AVIATION HOLDINGS INC.**, *et al.*, | § | **Case No. 12-40783 (CEC)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |

**DECLARATION OF JASON A. NAGI
SUPPORTING EMERGENCY RELIEF**

JASON A. NAGI, declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following statements are true and correct:

1.      I am a shareholder of the firm of Polsinelli PC, attorneys for Global Aviation Holdings Inc. and its affiliates as reorganized debtors in the above-captioned chapter 11 cases (collectively, "Global Aviation").  I make this affidavit based upon a review of documents in my

possession or subject to my control and based upon my knowledge and in support of Global

Aviation's Emergency Motion Under Bankruptcy Rule 1014(b) (the "1014 Motion").

### VENUE IN THE EDNY IS NOT PROPER

2.　　As set forth in the 1014 Motion, Global Aviation filed the Chapter 11 Cases[1] in

Delaware, where Global Aviation and its affiliates are incorporated and domiciled, because

Global Aviation can no longer satisfy the venue requirements to initiate new chapter 11 cases in

this Court under 28 U.S.C. § 1408.　However, the Delaware Court declined to proceed with

considering certain "first day" matters on the basis that Bankruptcy Rule 1014(b) stays all

proceedings in the Chapter 11 Cases until a determination is made by this Court to allow them to

proceed.　***Global Aviation requires emergency relief because the Delaware Court has***

***scheduled a hearing to further consider the first day matters in the Chapter 11 Cases at 12:30***

***p.m. Eastern Time on November 14, 2013.***　A copy of the agenda for the hearing in the

Delaware Court is attached to the 1014 Motion as Exhibit A.

### WITHOUT AN ORDER FROM THIS COURT, GLOBAL AVIATION CANNOT OBTAIN THE PROTECTION IT REQUIRES

3.　　Unfortunately, the Debtors are in limbo—unable to move forward with first day

hearings in the Delaware Court and unable to initiate new chapter 11 cases in this court due to

lack of venue.　***The Debtors need approval of their first day motions and will suffer immediate***

***and irreparable harm absent the ability to immediately proceed with the Chapter 11 Cases in***

***the Delaware Court.***　A summary of the relief requested in the first day motions filed in the

Delaware Court is attached to the 1014 Motion as Exhibit B.　In particular, certain of Global

Aviation's banks have frozen bank accounts pending entry of an order in the Chapter 11 Cases

authorizing Global Aviation to maintain its current bank accounts.　Further, absent access to its

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

2

proposed debtor-in-possession financing, Global Aviation will lack the liquidity to pay critical operating expenses, including payroll and amounts owed to vendors.  In short, absent authority to proceed with the Chapter 11 Cases in the Delaware Court, Global Aviation will have to cease all operations immediately.

4.      Notice of the 1014 Motion should be shortened to permit the Court to immediately consider the relief requested therein, and Global Aviation should be permitted to proceed in the Chapter 11 Cases in the Delaware Court.

5.      No previous application for similar relief has been made.


Dated: New York, New York
        November 13, 2013


                                            _/s/ Jason A. Nagi_____
                                            Jason A. Nagi

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | § | **Chapter 11** |
| | § | |
| GLOBAL AVIATION HOLDINGS INC., *et al.*, | § | **Case No. 12-40783 (CEC)** |
| | § | |
| Debtors. | § | **(Jointly Administered)** |

---

## ORDER GRANTING GLOBAL AVIATION HOLDINGS INC.'S EMERGENCY MOTION UNDER BANKRUPTCY RULE 1014(B)

Upon the motion (the "Motion")[1] of the Reorganized Debtors for entry of an order (the "Order") pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1014(b); and the Court having jurisdiction to consider the Motion and the relief requested; and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and an emergency hearing having been held to consider the relief requested in the Motion (the "Hearing"); and upon consideration of the record of the Hearing and all proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is appropriate; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.      The Motion is granted.

2.      Any stay, as and if applicable under Bankruptcy Rule 1014(b), is hereby lifted for the following chapter 11 cases filed by certain Reorganized Debtors in the United States Bankruptcy Court for the District of Delaware:

        a)      Global Aviation Holdings Inc., Case No. 13-12945 (MFW);

        b)      New ATA Investment Inc., Case No. 13-12946 (MFW);

        c)      New ATA Acquisition Inc., Case No. 13-12947 (MFW);

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

d)      World Air Holdings, Inc., Case No.13-12948 (MFW);

e)      World Airways, Inc., Case No. 13-12949 (MFW);

f)      North American Airlines, Inc., Case No. 13-12950 (MFW); and

g)      Global Shared Services, Inc., Case No. 13-12951 (MFW).

3.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.


Dated: _____            _____
                                   CARLA E. CRAIG
                                   UNITED STATES BANKRUPTCY JUDGE

POLSINELLI PC                         HAYNES AND BOONE, LLP
Jason A. Nagi, Esq.                   Henry Flores
900 Third Avenue, 21st Floor          1221 McKinney Street, Suite 2100
New York, New York 10022              Houston, Texas 77010
Tele: 212.659.7300                    Telephone: (713) 547-2000
Fax:  212.918.8989                    Facsimile: (713) 547-2600
Email:  jnagi@polsinelli.com          Email: henry.flores@haynesboone.com

POLSINELLI PC
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile.: (302) 252-0921
Email: cward@polsinelli.com
        jedelson@polsinelli.com

*PROPOSED COUNSEL TO THE DELAWARE
DEBTORS AND DEBTORS IN POSSESSION*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | § | **Chapter 11** |
| | § | |
| **GLOBAL AVIATION HOLDINGS INC.**, *et al.*, | § | **Case No. 12-40783 (CEC)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |

<u>**ORDER TO SHOW CAUSE FOR AN ORDER GRANTING GLOBAL AVIATION
HOLDINGS INC.'S EMERGENCY MOTION UNDER BANKRUPTCY RULE 1014(B)**</u>

**UPON READING AND FILING** the Declaration of Jason A. Nagi Supporting

Emergency Relief, sworn to November 13, 2013, the Emergency Motion Under Bankruptcy Rule

1014(b), and upon all papers and proceedings heretofore had herein,

Let any party in interest **SHOW CAUSE**, before the Honorable Chief Judge Carla Craig,

271 Cadman Plaza East, Courtroom 3529, Brooklyn, New York 11201, on the ___ day of

November, 2013, at _____ a.m./p.m., or as soon thereafter as counsel may be heard, why an

Order should not be made and entered herein authorizing Global Aviation Holdings Inc. and

certain of its affiliates (collectively "Global Aviation") to proceed under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware;

**SUFFICIENT CAUSE BEING ALLEGED THEREFOR,** it is hereby

**ORDERED** that personal service, service by electronic mail or service by facsimile, of a copy of this order to show cause, together with all other papers upon which it is granted, upon (a) counsel for the Debtors in the Prior Bankruptcy; (b) Alicia M. Leonhard and Marylou Martin of the United States Trustee for Region 2; (c) counsel for or representatives of any union in the Prior Bankruptcy; (d) counsel for the Unsecured Creditors' Committee in the Prior Bankruptcy; and (e) counsel for the Disbursing Agent for General Unsecured Claims under the Plan in the Prior Bankruptcy, be deemed good and sufficient service thereof; and it is further,

**ORDERED** that opposing papers, if any, are to be served upon Counsel for Global Aviation, Polsinelli PC, 900 Third Avenue, 21st Floor, New York, New York 10022, attention Jason A. Nagi, jnagi@polsinelli.com, and Haynes and Boone, LLP, 1221 McKinney, Suite 2100, Houston, Texas 77010, attention Henry Flores, henry.flores@haynesboone.com, so as to be received by __:__ on the ___ day of November, 2013.

_____
Honorable Carla Craig
United States Bankruptcy Judge